STEVEN BORTNER *v.* TOWN OF
WOODBRIDGE ET AL.
(SC 16114)

Callahan, C. J., and Borden, Berdon, Norcott and Katz, Js.

---

[16] In light of this conclusion, we need not reach the remaining issues briefed by the parties.

Argued June 11—officially released August 17, 1999

*William C. Longa* and *Donald W. Celotto, Jr.*, for the appellants (defendants).

*Barbara L. Cox*, with whom was *William F. Gallagher*, for the appellee (plaintiff).

*Opinion*

BORDEN, J. This appeal concerns a contested municipal election for the elementary board of education for the town of Woodbridge. The trial court rendered a judgment ordering a new election to be held, and we expedited the defendants'[1] appeal. Following the filing

---

[1] The defendants in the trial court were: the town of Woodbridge; the four successful candidates in the election in question, namely, Bonna M. Greene, James M. Carolan, Eleanor Sanders Sheehy and Marianne Vahey; Mary Lou Winnick, the head moderator of the election; Stephanie Ciarleglio, the town clerk of Woodbridge; Pamela Blessinger, the Democratic registrar of voters of Woodbridge; and L. Christine Laydon, the Republican registrar of voters of Woodbridge. All of the defendants, with the exception of Vahey, have appealed.

of simultaneous briefs and oral argument before this court, we announced the decision of this court from the bench on June 11, 1999, reversing the judgment of the trial court and ordering that the results of the election were to stand, with a written opinion to be filed in due course.[2] Hence, this opinion.

The principal issue in this appeal involves the standard to be applied under General Statutes § 9-328[3] for

[2] The decision of this court announced from the bench was as follows: "The judgment of the trial court is reversed. The results of the election of May 3, 1999, stand, and a written opinion will follow shortly."

[3] General Statutes § 9-328 provides: "Any elector or candidate claiming to have been aggrieved by any ruling of any election official in connection with an election for any municipal office or a primary for justice of the peace, or any elector or candidate claiming that there has been a mistake in the count of votes cast for any such office at such election or primary, or any candidate in such an election or primary claiming that he is aggrieved by a violation of any provision of sections 9-355, 9-357 to 9-361, inclusive, 9-364, 9-364a or 9-365 in the casting of absentee ballots at such election or primary, may bring a complaint to any judge of the Superior Court for relief therefrom. In any action brought pursuant to the provisions of this section, the complainant shall send a copy of the complaint by first-class mail, or deliver a copy of the complaint by hand, to the State Elections Enforcement Commission. If such complaint is made prior to such election or primary, such judge shall proceed expeditiously to render judgment on the complaint and shall cause notice of the hearing to be given to the Secretary of the State and the State Elections Enforcement Commission. If such complaint is made subsequent to such election or primary, it shall be brought within fourteen days of such election or primary to any judge of the Superior Court, in which he shall set out the claimed errors of the election official, the claimed errors in the count or the claimed violations of said sections. Such judge shall forthwith order a hearing to be had upon such complaint, upon a day not more than five nor less than three days from the making of such order, and shall cause notice of not less than three nor more than five days to be given to any candidate or candidates whose election or nomination may be affected by the decision upon such hearing, to such election official, the Secretary of the State, the State Elections Enforcement Commission and to any other party or parties whom such judge deems proper parties thereto, of the time and place for the hearing upon such complaint. Such judge shall, on the day fixed for such hearing and without unnecessary delay, proceed to hear the parties. If sufficient reason is shown, he may order any voting machines to be unlocked or any ballot boxes to be opened and a recount of the votes cast, including absentee ballots, to be made. Such judge shall thereupon, if he finds any error in the rulings of the election

a trial court to order a new election. The defendants appeal[1] from the judgment of the trial court ordering a new election, in response to the complaint of the plaintiff, Steven Bortner, the sole unsuccessful candidate in the election.[5] The defendants claim that the trial court improperly: (1) found that one of the voting machines was out of paper for write-in voting during a significant part of the voting hours; (2) refused to open the evidence, after its decision, to admit certain election records regarding that machine; (3) determined that a new election was justified pursuant to § 9-328; and (4) ordered a new election at which all of the candidates

official or any mistake in the count of the votes, certify the result of his finding or decision to the Secretary of the State before the tenth day succeeding the conclusion of the hearing. Such judge may order a new election or primary or a change in the existing election schedule. Such certificate of such judge of his finding or decision shall be final and conclusive upon all questions relating to errors in the ruling of such election officials, to the correctness of such count, and, for the purposes of this section only, such claimed violations, and shall operate to correct the returns of the moderators or presiding officers, so as to conform to such finding or decision, except that this section shall not affect the right of appeal to the Supreme Court and it shall not prevent such judge from reserving such questions of law for the advice of the Supreme Court as provided in section 9-325. Such judge may, if necessary, issue his writ of mandamus, requiring the adverse party and those under him to deliver to the complainant the appurtenances of such office, and shall cause his finding and decree to be entered on the records of the Superior Court in the proper judicial district."

[1] The defendants purported to appeal directly to this court pursuant to General Statutes § 51-199 (b) (5), which, insofar as it might apply to the present case, provides for a direct appeal to this court in "any election . . . dispute brought to the Supreme Court pursuant to . . . section 9-325 . . . ." Technically, however, this is not an appeal pursuant to General Statutes § 9-325 because such an appeal involves a certification, by the trial court to the Chief Justice of this court, of the trial court's findings of fact and rulings of law, followed by a special session of this court, none of which occurred in this case. Cf. *Wrinn* v. *Dunleavy*, 186 Conn. 125, 130–31, 440 A.2d 261 (1982). Nonetheless, we treat this appeal, which is from the final judgment of the trial court, as if it had been filed in the Appellate Court and we had transferred it from that court pursuant to § 51-199 (c).

[5] There was also a registered write-in candidate for the Amity regional board of education, who was unsuccessful but did not challenge the results of that election.

would be required to run, rather than just the plaintiff and the successful candidate with the next closest number of votes to him. We reverse the judgment of the trial court and remand the case with direction to render judgment for the defendants.

On May 13, 1999, the plaintiff filed the complaint in this case challenging the result of the election held on May 3, 1999. The case was tried to the trial court on May 19 and 21, 1999, and on May 21, the trial court issued an oral memorandum of decision ordering a new election to be held on June 22, 1999. This appeal followed.

Certain facts are undisputed. In the May 3, 1999 election, there were five candidates for four available positions on the Woodbridge elementary board of education (board).[6] The plaintiff was one of the five candidates, and was the only registered write-in candidate pursuant to General Statutes § 9-373a.[7] Prior to the election, all

---

[6] In addition to the contest for the board, the municipal election determined the following offices: first selectman; selectmen; board of assessment appeals; zoning board of appeals; zoning board of appeals alternate; and regional board of education.

[7] General Statutes § 9-373a provides: "Any person desiring to be a write-in candidate for any state, district or municipal office to be filled at any regular election shall register his candidacy with the Secretary of the State on a form prescribed by the secretary. The registration shall include the candidate's name and address, the designation and term of the office sought, a statement of consent to the candidacy, and any other information which the secretary deems necessary. In the case of a write-in candidacy for the office of Governor or Lieutenant Governor, the registration shall include a candidate for each of those offices, or shall be void. The registration shall not include a designation of any political party. The registration shall be filed with the secretary not more than ninety days prior to the election at which the office is to be filled and not later than four o'clock p.m. on the fourteenth day preceding the election, or the registration shall be void. No person nominated for an office by a major or minor party or by nominating petition shall register as a write-in candidate for that office under the provisions of this section, and any registration of a write-in candidacy filed by such a person shall be void. Notwithstanding any provision of this section to the contrary, any person desiring to be a write-in candidate for the municipal office of town meeting member in any town having a representative town meeting which has seventy-five or more members shall register

of the voting machines had been inspected and certified by the office of the secretary of the state in accordance with state law, and all of the machines had been inspected and serviced by the town's election machine mechanic. In addition, prior to the election, all of the candidates had been afforded the opportunity to inspect the machines. The plaintiff took that opportunity, and did not make any complaint to any election official. Furthermore, prior to the election, all of the machines were tested and were functioning properly, including the recording of write-in votes.

The polling place was open from 6 a.m. to 8 p.m. There were eight voting machines operating at the opening, plus one replacement machine. Each elector was entitled to cast one vote for each of any two of the five candidates for the board. A total of 3057 electors cast their ballots in the election. The election returns showed the following votes for the various candidates for the board: (1) 1250 votes for James M. Carolan; (2) 1142 votes for Marianne Vahey; (3) 1081 votes for Eleanor Sanders Sheehy; (4) 987 votes for Bonna M. Greene; and (5) 931 votes for the plaintiff.[8] Therefore, according to the vote count, Carolan, Vahey, Sheehy and Greene would have been elected, and the plaintiff would have lost to Greene, the next closest successful candidate, by fifty-six votes. The plaintiff did not request a recanvass pursuant to General Statutes § 9-311,[9] and

his candidacy with the town clerk of such town not later than the last business day preceding such election."

[8] Of the 931 votes cast for the plaintiff, 872 resulted from write-in votes on the voting machines, and 59 votes were cast by electors using absentee ballots.

[9] General Statutes § 9-311 provides: "(a) If, within three days after an election, it appears to the moderator that there is a discrepancy in the returns of any voting district, such moderator shall forthwith within said period summon, by written notice delivered personally, the recanvass officials, consisting of the mechanic or mechanics, at least two checkers of different political parties and at least two absentee ballot counters of different political parties who served at such election, and the registrars of voters and the clerk of the municipality in which the election was held. Such

none was required by law pursuant to General Statutes

written notice shall require such clerk to bring with him the depository envelopes required by section 9-150a, the package of write-in ballots provided for in section 9-310, the absentee ballot applications, the list of absentee ballot applications, the registry list and the moderators' returns and shall require such recanvass officials to meet at a specified time not later than the fifth business day after such election to recanvass the returns of a voting machine or voting machines or absentee ballots or write-in ballots used in such district in such election. If any of such recanvass officials are unavailable at the time of the recanvass, the registrar of voters of the same political party as that of the recanvass official unable to attend shall designate another elector having previous training and experience in the conduct of elections to take his place. Before such recanvass is made, such moderator shall give notice, in writing, to the chairman of the town committee of each political party which nominated candidates for the election, and, in the case of a state election, to the Secretary of the State, of the time and place where such recanvass is to be made; and each such chairman may send two representatives to be present at such recanvass. Such representatives may observe, but no one other than a recanvass official may take part in the recanvass. If any irregularity in the recanvass procedure is noted by such a representative, he shall be permitted to present evidence of such irregularity in any contest relating to the election.

"(b) The moderator shall determine the place or places where the recanvass shall be conducted and, if such recanvass is held before the machines are boxed and collected in the manner required by section 9-266, the moderator may either require that such recanvass of such machines be conducted in each place where the machines are located, or he may require that they be removed to one central place, where such recanvass shall be conducted. All recanvassing procedures shall be open to public observation. Such recanvass officials shall, in the presence of such moderator and clerk, make a record of the number on the seal and the number on the protective counter, if one is provided, on each voting machine specified by such moderator. Such clerk in the presence of such moderator shall turn over the keys of each such machine to such recanvass officials, and such recanvass officials, in the presence of such clerk and moderator, shall immediately proceed to open the counter compartment of each such machine and, without unlocking such machine against voting, recanvass the vote cast thereon, and shall then open the package of absentee ballots and recanvass the vote cast thereon. In the course of the recanvass of the absentee ballot vote the recanvass officials shall check all outer envelopes for absentee ballots against the inner envelopes for such ballots and against the registry list to verify postmarks, addresses and registry list markings and also to determine whether the number of envelopes from which absentee ballots have been removed is the same as the number of persons checked as having voted by absentee ballot. The write-in ballots shall also be recanvassed at this time. All of the recanvass officials shall use the same forms for tallies and returns as were

## § 9-311a.[10]

used at the original canvass and the absentee ballot counters shall also sign the tallies.

"(c) The votes shall be announced and recorded in the manner prescribed in section 9-309 on return forms provided by the municipal clerk and appended thereto shall be a statement signed by the moderator indicating the time and place of the recanvass and the names, addresses, titles and party affiliations of the recanvass officials. The write-in ballots shall be replaced in a properly secured sealed package. Upon the completion of such recanvass, such machine shall be locked and sealed, the keys thereof shall immediately be returned to such clerk and such machine shall remain so locked until the expiration of fourteen days after such election or for such longer period as is ordered by a court of competent jurisdiction. The absentee ballots shall be replaced in their wrappers and be resealed by the moderator in the presence of the recanvass officials. Upon the completion of such recanvass, such moderator and at least two of the recanvass officials of different political parties shall forthwith prepare and sign such return forms which shall contain a written statement giving the result of such recanvass for each machine and each package of absentee ballots whose returns were so recanvassed, setting forth whether or not the original canvass was correctly made and stating whether or not the discrepancy still remains unaccounted for. Such return forms containing such statement shall forthwith be filed by the moderator in the office of such clerk. If such recanvass reveals that the original canvass of returns was not correctly made, such return forms containing such statement so filed with the clerk shall constitute a corrected return. In the case of a state election, a recanvass return shall be made in duplicate on a form prescribed and provided by the Secretary of the State, and the moderator shall file one copy with the Secretary of the State and one copy with the town clerk not later than ten days after the election. Such recanvass return shall be substituted for the original return and shall have the same force and effect as an original return.

"(d) As used in this section, (1) 'moderator' means, in the case of municipalities not divided into voting districts, the moderator of the election and, in the case of municipalities divided into voting districts, the head moderator of the election, and (2) 'registrars of voters', in a municipality where there are different registrars of voters for different voting districts, means the registrars of voters in the voting district in which, at the last-preceding election, the presiding officer for the purpose of declaring the result of the vote of the whole municipality was moderator."

[10] General Statutes § 9-311a provides: "For purposes of this section, state, district and municipal offices shall be as defined in section 9-372 except that the office of presidential elector shall be deemed a state office. Forthwith after a regular or special election for municipal office, or forthwith upon tabulation of the vote for state and district offices by the Secretary of the State, when at any such election the plurality of an elected candidate for an office over the vote for a defeated candidate receiving the next highest

In his complaint, the plaintiff, relying on § 9-328,[11] alleged that voters desiring to vote for him were prevented from doing so by voting machine malfunctions, which included the following: one or more of the machines ran out of paper for casting write-in ballots; on one or more of the machines, the sections for write-in candidates were not accessible because the metal

number of votes was either (1) less than a vote equivalent to one-half of one per cent of the total number of votes cast for the office but not more than two thousand votes, or (2) less than twenty votes, there shall be a recanvass of the returns of the voting machine or voting machines and absentee ballots used in such election for such office unless such defeated candidate or defeated candidates, as the case may be, for such office file a written statement waiving this right to such canvass with the municipal clerk in the case of a municipal office, or with the Secretary of the State in the case of a state or district office. In the case of state and district offices, the Secretary of the State upon tabulation of the votes for such offices shall notify the town clerks in the state or district, as the case may be, of the state and district offices which qualify for an automatic recanvass and shall also notify each candidate for any such office. When a recanvass is to be held the municipal clerk shall promptly notify the moderator, as defined in section 9-311, who shall proceed forthwith to cause a recanvass of such returns of the office in question in the same manner as is provided in said section 9-311. In addition to the notice required under section 9-311, the moderator shall before such recanvass is made give notice in writing of the time when, and place where, such recanvass is to be made to each candidate for a municipal office which qualifies for an automatic recanvass under this section. Nothing in this section shall preclude the right to judicial proceedings on behalf of a candidate under any provision of chapter 149. For the purposes of this section, 'the total number of votes cast for the office' means in the case of multiple openings for the same office, the total number of electors checked as having voted in the state, district, municipality or political subdivision, as the case may be. When a recanvass of the returns for an office for which there are multiple openings is required by the provisions of this section, the returns for all candidates for all openings for the office shall be recanvassed. No one other than a recanvass official shall take part in the recanvass. If any irregularity in the recanvass procedure is noted by a candidate, he shall be permitted to present evidence of such irregularity in any contest relating to the election."

[11] The plaintiff also made certain allegations regarding purported failures "to conform to hardware standards imposed by state regulation, including [§ 9-241-20 of the Regulations of Connecticut State Agencies]." The trial court made no findings or legal conclusions regarding this claim, and the plaintiff has not pursued it on appeal. We therefore disregard it.

doors would not open; on one or more of the machines, the paper for the write-in candidates did not advance properly; and on one or more of the machines, the write-in slots were not readily visible to or accessible for voters of short stature. The plaintiff alleged further that, as a result of these irregularities and malfunctions, and "various . . . rulings of election officials, there has been a failure to record votes and, consequently, a mistake in the count of the votes cast at [the] election . . . ." The plaintiff also alleged that, "[b]ut for the improper actions of the elected officials and the irregularities which occurred, there is a substantial likelihood that the result of said election would have been different."

On the basis of these allegations, the trial court held an expedited trial[12] on May 19 and 21, 1999. At the conclusion of the trial, the court issued an oral memorandum of decision vacating the results of the election, and ordering a new election, to be held on June 22, 1999, for *all* candidates for the board in the May 3, 1999 election.[13] The court found "that there were complaints throughout the day to election officials, not all of which were properly recorded and to which not all were attended in an expeditious and appropriate fashion." In support of this general finding, the court made the following "underlying factual findings." On voting machine number 143719, the paper for write-in candidates was not advancing at 6:50 a.m. Although that machine was taken out of service and replaced at that

---

[12] Because of the expedited nature of the proceedings, the defendants did not file an answer to the complaint.

[13] On appeal, the town claims that, if a new election were to be required, it should be confined to a run-off between the plaintiff and Greene, the candidate who received the next closest number of votes. The plaintiff agrees with this contention. The other defendants, however, who are represented by separate counsel, claim that a run-off election would not be appropriate. In view of our conclusion that a new election is not warranted, we need not reach this issue.

time, "that issue that early in the day affecting certainly one candidate more than others—in other words, there was only one candidate that depended on paper at that point or that kind of paper[14] . . . should have served as some sort of notice to the election officials that scrutiny of the mechanics of all of the machines needed to be undertaken throughout the day with some care."

The trial court also found that voting machine number 150231 had a significant problem throughout the day, in that there were reports to election officials concerning that machine at 1:40 p.m., 2:50 p.m. and 3 p.m., and the 1:40 p.m. report involved a perceived inability to cast a write-in vote for the plaintiff. The court further found that this machine "never continued to function adequately," and that it was not checked at 3 p.m., although there was a complaint regarding it at that time.

The trial court also found that voting machine number 106949 had a paper jam at 4:45 p.m., when it was taken out of service. The court noted that "the only candidate that depended upon paper of this kind was the write-in candidate," namely, the plaintiff. See footnote 5 of this opinion.

The trial court found further that, at 6:30 p.m., voting machine number 107017 had no paper and was taken out of service. The court also found "as a fact that [this machine] had been out of paper since at least 8:30 a.m."

On the basis of these specific findings, the trial court concluded "that there were mistakes in the count and that to the extent that election officials in a de facto manner ruled throughout the day that they did not need to continue to inspect the voting machines in use in

---

[14] The evidence was undisputed that, in addition to the plaintiff, there was one other write-in candidate, who was competing for a position on the regional board of education. In view of this evidence, we regard the statement of the trial court as referring only to the candidates for the elementary board of education.

order to ensure that there were not problems with the mechanics, in particular of the write-in votes, [there] were errors." The court also concluded that, "[g]iven the close vote, the court [felt] it has really no mandate in this situation other than to order a new election."

On May 27, 1999, the defendants moved to open the evidence to permit them to introduce certain official records of the election that, according to their representations, contained an accurate count of the number of voters who had entered each voting machine on an hourly basis, and that would demonstrate conclusively that one of the trial court's findings, namely, that voting machine number 107017 had been out of paper since at least 8:30 a.m., was incorrect. The defendants attached copies of those records to their motion, represented that the records constituted "business record evidence," and asserted that the records had been omitted from the evidence by inadvertence or mistake, and that their absence would result in a serious danger of a miscarriage of justice. The plaintiff opposed the motion, pointing out to the court that, among other reasons, the defendants had produced the records at trial in response to the plaintiff's subpoena, but had not offered them. The court denied the defendants' motion.

The defendants raise a number of claims on appeal. We conclude that: (1) the trial court abused its discretion in refusing to open the evidence to consider the election records offered by the defendants; and (2) the record does not support the conclusion that a new election was warranted under § 9-328. Accordingly, we reverse the judgment of the trial court.

I

Section 9-328 cannot be read in a vacuum. It must be read against its fundamental governmental background. That background counsels strongly that a court should be very cautious before exercising its power under the

statute to vacate the results of an election and to order a new election.

First, under our democratic form of government, an election is the paradigm of "the democratic process designed to ascertain and implement the will of the people." *In re Election for Second Congressional District*, 231 Conn. 602, 625, 653 A.2d 79 (1994). The purpose of the election statutes "is to ensure the true and most accurate count possible of the votes for the candidates in the election." Id., 633. Those statutes rest on "the bedrock principle that the purpose of the voting process is to ascertain the intent of the voters." Id., 621. In implementing that process, moreover, when an individual ballot is questioned, "no voter is to be disfranchised on a doubtful construction, and statutes tending to limit the exercise of the ballot should be liberally construed in his [or her] favor." (Internal quotation marks omitted.) Id., 653. Our election laws, moreover, generally vest the primary responsibility for ascertaining that intent and will on the election officials, subject, of course, to the court's appropriate scope of review when the officials' determination is challenged in a judicial proceeding. See id., 658. We look, therefore, first and foremost to the election officials to manage the election process so that the will of the people is carried out.

Second, § 9-328 authorizes the one unelected branch of government, the judiciary, to dismantle the basic building block of the democratic process, an election. Thus, "[t]he delicacy of judicial intrusion into the electoral process"; *Lobsenz* v. *Davidoff*, 182 Conn. 111, 124, 438 A.2d 21 (1980) (*Peters, J.*, dissenting); strongly suggests caution in undertaking such an intrusion. As we have indicated, therefore, § 9-328 provides for remedies only "under narrowly defined circumstances"; *Scheyd* v. *Bezrucik*, 205 Conn. 495, 496–97, 535 A.2d 793 (1987); and for "limited types of claims . . . ." Id., 502.

Third, § 9-328 requires a court, in determining whether to order a new election, to arrive at a sensitive balance among three powerful interests, all of which are integral to our notion of democracy, but which in a challenged election may pull in different directions. One such interest is that each elector who properly cast his or her vote in the election is entitled to have that vote counted. Correspondingly, the candidate for whom that vote properly was cast has a legitimate and powerful interest in having that vote properly recorded in his or her favor. When an election is challenged on the basis that particular electors' votes for a particular candidate were not properly credited to him, these two interests pull in the direction of ordering a new election. The third such interest, however, is that of the rest of the electorate who voted at a challenged election, and arises from the nature of an election in our democratic society, as we explain in the discussion that follows. That interest ordinarily will pull in the direction of letting the election results stand.

An election is essentially—and necessarily—a snapshot. It is preceded by a particular election campaign, for a particular period of time, which culminates on a particular date, namely, the officially designated election day. In that campaign, the various parties and candidates presumably concentrate their resources—financial, political and personal—on producing a victory on that date. When that date comes, the election records the votes of those electors, and only those electors, who were available to and took the opportunity to vote—whether by machine lever, write-in or absentee ballot—on that particular day. Those electors, moreover, ordinarily are motivated by a complex combination of personal and political factors that may result in particular combinations of votes for the various candidates who are running for the various offices.

The snapshot captures, therefore, only the results of the election conducted on the officially designated election day. It reflects the will of the people as recorded on that particular day, after that particular campaign, and as expressed by the electors who voted on that day. Those results, however, although in fact reflecting the will of the people as expressed on that day and no other, under our democratic electoral system operate nonetheless to vest power in the elected candidates for the duration of their terms. That is what we mean when we say that one candidate has been "elected" and another "defeated." No losing candidate is entitled to the electoral equivalent of a "mulligan."[15]

Moreover, that snapshot can never be duplicated. The campaign, the resources available for it, the totality of the electors who voted in it, and their motivations, inevitably will be different a second time around. Thus, when a court orders a *new* election, it is really ordering a *different* election. It is substituting a different snapshot of the electoral process from that taken by the voting electorate on the officially designated election day.

Consequently, all of the electors who voted at the first, officially designated election—3057 electors in the present case—have a powerful interest in the stability of that election because the ordering of a new and different election would result in *their* election day disfranchisement. The ordering of a new and different election in effect disfranchises all of those who voted at the first election because their validly cast votes no longer count, and the second election can never duplicate the complex combination of conditions under which they cast their ballots.

---

[15] A "mulligan" is "a free shot sometimes awarded a golfer in nontournament play when the preceding shot has been poorly played." Webster's Third New International Dictionary (1971).

All of these reasons strongly suggest that, although a court undoubtedly has the power to order a new election pursuant to § 9-328 and should do so if the statutory requirements have been met, the court should exercise caution and restraint in deciding whether to do so. A proper judicial respect for the electoral process mandates no less. With these principles in mind, therefore, we turn to the dispositive issues of this appeal.

## II

We next address the burden that § 9-328 places on a plaintiff who seeks to secure a new election. The defendants claim that the plaintiff was obligated to establish that, as a result of any proven irregularities cognizable by the statute, he would have won the election, that is, he would have received at least fifty-seven more votes than he did receive and, therefore, would have received more votes than Greene. The plaintiff, although not offering on appeal[16] any standard under the statute,[17] claims that the trial court was justified on the facts of this case in ordering a new election.

[16] In his complaint in the trial court, the plaintiff alleged that but for the various electoral improprieties, "there is a *substantial likelihood* that the result of [the] election would have been different." (Emphasis added.) On appeal, however, the plaintiff does not revive this standard, claiming instead that "the malfunctions of the voting machines' write-in functions so compromised the integrity of the voting process that it was *impossible to make an accurate count* of the votes intended to be cast for [the plaintiff]." (Emphasis added.)

[17] The plaintiff relies, instead, on the language found in a *different* statute, namely, General Statutes § 9-329a, which governs challenges to primary elections. The plaintiff argues that the legislature, by including a mandate in § 9-329a that a new election may be ordered only when the court determines that "the result of such primary might have been different," and not including similar language in § 9-328, "has clearly signaled that the challenger to the municipal election need not prove that the result would have been different without the mistake in the count or erroneous rulings." We need not decide in the present case whether the two statutes contain the same or different standards. Instead, we decide the question of the plaintiff's burden by focusing on the language and legislative history of the statute at issue in this case, namely, § 9-328, as well as the role that this statute plays in the overall electoral process.

We conclude that § 9-328 does not require a challenger, in order to secure a judicial order for a new election, to establish that, but for the irregularities that he has established as a factual matter, he would have prevailed in the election. We conclude instead that, in order for a court to overturn the results of an election and order a new election pursuant to § 9-328, the court must be persuaded that: (1) there were substantial violations of the requirements of the statute, which we discuss in more detail in parts IV and V of this opinion; and (2) as a result of those violations, the reliability of the result of the election is seriously in doubt. We conclude further that, although the underlying facts are to be established by a preponderance of the evidence and are subject on appeal to the clearly erroneous standard; see Practice Book § 60-5; the ultimate determination of whether, based on those underlying facts, a new election is called for—that is, whether there were substantial violations of the statute that render the reliability of the result of the election seriously in doubt— is a mixed question of fact and law that is subject to plenary review on appeal.

The determination of the standard to be applied under the statute presents a question of statutory interpretation. "The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, 231 Conn. 418, 431, 650 A.2d 557 (1994). In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter.

. . . Id.; *Carpenteri-Waddington, Inc.* v. *Commissioner of Revenue Services*, 231 Conn. 355, 362, 650 A.2d 147 (1994); *United Illuminating Co.* v. *Groppo*, 220 Conn. 749, 755–56, 601 A.2d 1005 (1992)." (Internal quotation marks omitted.) *United Illuminating Co.* v. *New Haven*, 240 Conn. 422, 431–32, 692 A.2d 742 (1997).

We begin, as we ordinarily do in interpreting statutes, with the statutory language. Section 9-328 provides in relevant part: "Such judge shall, on the day fixed for such hearing [on the plaintiff's complaint] and without unnecessary delay, proceed to hear the parties. If sufficient reason is shown, he may order any voting machines to be unlocked or any ballot boxes to be opened and a recount of the votes cast, including absentee ballots, to be made. Such judge shall thereupon, *if he finds any error in the rulings of the election official or any mistake in the count of the votes*, certify the result of his finding or decision to the Secretary of the State before the tenth day succeeding the conclusion of the hearing. *Such judge may order a new election or primary or a change in the existing election schedule. . . .*" (Emphasis added.) The italicized language makes clear that, as a predicate for the ordering of a new election under § 9-328, there must be either (1) an error or errors "in the rulings of" an election official, or (2) a "mistake in the count of the votes."[18] See also *Scheyd* v. *Bezrucik*, supra, 205 Conn. 503; *Wrinn* v. *Dunleavy*, 186 Conn. 125, 134 n.10, 440 A.2d 261 (1982). That language does not make clear, however, what standard must be met in order for the court to order a new election. Indeed, it does not state, either directly or by implication, how significant the errors in the rulings or the mistakes in the count must be, and how likely it

---

[18] We discuss in greater detail in parts IV and V of this opinion, whether, in the present case, there was either an erroneous ruling of an election official or a mistake in the count of the votes.

was that the errors or mistakes affected the result of the election.

The genealogy and legislative history of the statute, however, offer guidance on this question. Until 1978, § 9-328 did not authorize a judge to order a new election. See General Statutes (Rev. to 1977) § 9-328.[19] In 1978,

[19] General Statutes (Rev. to 1977) § 9-328 provides: "Any person claiming to have been elected to any municipal office, or nominated at a primary to the office of justice of the peace, but not to have been declared so elected or nominated, or any candidate for any such office claiming to have been aggrieved by any ruling of the moderator at an election for any such office or a primary for justice of the peace, or any such candidate claiming that there has been a mistake in the count of votes cast for any such office at any such election or primary, may, within ten days after the date of the election or primary, bring his complaint to any judge of the superior court, in which he shall set out the claimed errors of the moderator or the claimed errors in the count. Such judge shall forthwith order a hearing to be had upon such complaint, upon a day not more than five nor less than three days from the making of such order, and shall cause notice of not less than three nor more than five days to be given to any candidate or candidates whose election or nomination may be affected by the decision upon such hearing, and to any other party or parties whom such judge deems proper parties thereto, of the time and place for the hearing upon such complaint. Such judge or, in case of his inability, a judge designated by the chief judge of the superior court, shall, on the day fixed for such hearing and without unnecessary delay, proceed to hear the parties. If sufficient reason is shown, he may order any voting machines to be unlocked or any ballot boxes to be opened and a recount of the votes cast, including absentee ballots, to be made, and he shall thereupon, if he finds any error in the rulings of the moderator or any mistake in the count of the votes, certify the result of his finding or decision to the secretary of the state before the tenth day succeeding the conclusion of the hearing. Such certificate of such judge of his finding or decision shall be final and conclusive upon all questions relating to errors in the ruling of such moderators and to the correctness of such count, and shall operate to correct the returns of such moderators or presiding officers, so as to conform to such finding or decision, except that this section shall not affect the right of appeal to the supreme court for the reservation of questions arising thereon, and it shall not prevent such judge from reserving such questions of law, by consent of all parties, for the advice of the supreme court. Such judge may, if necessary, issue his writ of mandamus, requiring the adverse party and those under him to deliver to the complainant the appurtenances of such office, and shall cause his finding and decree to be entered on the records of the superior court in the proper county."

the legislature enacted No. 78-125 of the 1978 Public Acts. Section 9 of Public Act 78-125 amended General Statutes (Rev. to 1977) § 9-328 by, among other things, adding the language: "Such judge may order a new election or primary or a change in the existing election schedule. . . ." The legislative history regarding this amendment, however, is unilluminating.[20]

In 1987, the legislature again amended § 9-328 as part of an omnibus election law bill entitled, "An Act concerning Judicial Hearings concerning Absentee Ballots." See Public Acts 1987, No. 87-545. Section 3 of Public Act 87-545 amended § 9-328 by adding language that specifically brought within its terms fraudulent conduct and other improprieties in the casting of absentee ballots.[21] The legislative debate in the House of Representatives directly addressed the standard that must be met under § 9-328 in order for a judge to order a new election.[22] That debate indicates a legislative intent

---

[20] The only reference in the legislative history of Public Act 78-125 to the newly added judicial power was the following: "Sections 6 through 12 of the bill clarify the provisions of the election laws with respect to access to the courts by persons aggrieved by rulings of election officials. In general, they make it clear that any voter, including of course, the candidates themselves may apply to an appropriate court for relief from a ruling of an election official either before or after an election or primary. The sections further make clear that the court may order appropriate remedies including a new election or primary, where warranted by the facts." 21 H.R. Proc., Pt. 4, 1978 Sess., p. 1456, remarks of Representative Elmer W. Lowden.

[21] Section 3 of Public Act 87-545 added to § 9-328 provisions permitting a candidate to claim that he was "aggrieved by a violation of any provision of sections 9-355, 9-357 to 9-361, inclusive, 9-364, 9-364a or 9-365 in the casting of absentee ballots at such election or primary . . . ."

[22] The following colloquy took place between Representatives Robert F. Frankel and Martin M. Looney during the legislative debate in the House of Representatives:

"[Representative Frankel]: Mr. Speaker, just one, perhaps two questions for legislative intent. As I understand the existing statutes, which we are about to act on amending, one can use this procedure where the outcome of an election may be at stake, and now we are going to provide that any alleged violation of these other sections would also be reason to go to court. The operative language . . . when under these new areas, the judges may order a new election.

that, although a candidate who challenges an election need not necessarily prove that he would have won the election but for the improprieties that he established,

"Through you, Mr. Speaker, if the violation were to be found by the judge, but it was not of a substantial nature such that the election results would change, and I will give you an example. Is it our intent to have a judge order a new election in instances such as I am about to outline, where they are minimal, that they may make other findings, but would be advised not to order a new election?

"And let me give you an example. If, for example, an allegation under one of these sections was brought that someone had voted three or four times, and indeed, it is a violation of one of these sections. And, after a hearing, a judge found out indeed that was, in his belief, the case, but the outcome of the election wouldn't be affected, because perhaps the final result was say: 500 votes difference, and the fraud that was found involved only three or four difference. Under those circumstances, I trust that we are not directing the judge to order a new election.

"Through you, Mr. Speaker.

"[Speaker Irving J. Stolberg]: Representative Looney.

"[Representative Looney]: Yes, Mr. Speaker, through you to the Majority Leader, for purposes of legislative intent. The Majority Leader is correct. It is not the intent of this amendment that a judge would overturn an election or primary unless the violation was major. It would not be the intent to have the remedy far out-strip the events.

"[Representative Frankel]: Through you, Mr. Speaker, just a follow-up on that. Obviously, we are in areas where there would be substantial violations where, perhaps, might change the results, and I would assume that if unclear, but they were substantial, the judge could order a new election.

"Through you, Mr. Speaker.

"[Speaker Stolberg]: Representative Looney.

"[Representative Looney]: Through you, Mr. Speaker, to the Majority Leader. Yes, that is correct. If the violations were substantial, the judge could order a new election, if he believed that the election was so compromised that that was the best and approved and most equitable remedy.

"[Representative Frankel]: Thank you, Mr. Speaker." 30 H.R. Proc., Pt. 30, 1987 Sess., pp. 11,021–24.

Although this was not the legislature that enacted the original provision for a judicially ordered new election, and although we ordinarily do not regard subsequent legislative debate on the intent of earlier enacted legislation as particularly persuasive regarding that intent, we do regard this colloquy as relevant to the meaning of § 9-328. First, this colloquy took place in the context of an enacted amendment to the statute at issue. Second, the judicial power provided by that amendment bore directly on the scope of that power, albeit enacted in an earlier year. Third, it is apparent from the pointed language of the colloquy that the participants intended it to be used as indicative of legislative intent regarding the scope of that power.

he would be required, in the language of the debate, to prove that there were "substantial violations [that] . . . might change the results, and . . . if unclear, but . . . substantial, the judge could order a new election . . . if he believed that the election was so compromised that that was the best . . . remedy." 30 H.R. Proc., Pt. 30, 1987 Sess., pp. 11,023–24, remarks of Representatives Robert F. Frankel and Martin M. Looney; see footnote 22 of this opinion.

Finally, in interpreting § 9-328, we are cognizant of the delicate balance of interests at stake in the electoral process. Taking into account the legislative language, its genealogy and history, and the balance of interests involved, we glean the following standard that must be met in order for a court to order a new election pursuant to § 9-328. The court must be persuaded that: (1) there were substantial errors in the rulings of an election official or officials, or substantial mistakes in the count of the votes; and (2) as a result of those errors or mistakes, the reliability of the result of the election, as determined by the election officials, is seriously in doubt.

We next address our scope of review regarding a decision by a trial court to order, or to decline to order, a new election pursuant to § 9-328. We conclude that the underlying historical facts as found by the trial court are, of course, subject on review to the clearly erroneous standard. See Practice Book § 60-5. Beyond that, however, we conclude that whether any rulings of an election official or mistakes in the count of votes were substantial, and whether the result of the election is seriously in doubt, are questions that call for plenary review on appeal.

These questions are most accurately characterized, not as either questions of fact or as questions of law, but as the hybrid mixed questions of fact and law. Although

throughout the law there are various mixed questions that call for differing scopes of appellate review and, therefore, applying the label does not necessarily yield the answer; see, e.g., *Copas* v. *Commissioner of Correction*, 234 Conn. 139, 152–53, 662 A.2d 718 (1995) (mixed question of law and fact yielding plenary review); *Plastic Tooling Aids Laboratory, Inc.* v. *Commissioner of Revenue Services*, 213 Conn. 365, 369, 567 A.2d 1218 (1990) (mixed question of law and fact yielding review under clearly erroneous standard); the question of whether to give such a mixed determination by a trial court deferential or plenary review is really a question of judicial policy. *Miller* v. *Fenton*, 474 U.S. 104, 114, 106 S. Ct. 445, 88 L. Ed. 2d 405 (1985) (when "the issue falls somewhere between a pristine legal standard and a simple historical fact, the fact/law distinction at times has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question"). The importance of the democratic interests at stake, the importance of seeing that the balance of those interests is struck properly in any given case, and the delicacy of the question of judicial intrusion into the electoral process, persuade us that a plenary scope of review is appropriate.

## III

With these background principles and standards in mind, we turn to the defendants' specific claims on appeal. We first consider their claim that the trial court abused its discretion in denying their motion to open the evidence. We agree with the defendants. We conclude that, under the circumstances of this case, the court should have opened the evidence to consider the documentary evidence that the defendants sought to offer. We further conclude that the undisputed facts disclosed by those documents wholly undermine a critical finding of the trial court regarding voting machine

number 107017, namely, that this machine, which was taken out of service at 6:30 p.m., had been out of paper since at least 8:30 a.m. on election day, and that, therefore, that finding must be disregarded.

"Whether or not a trial court will permit further evidence to be offered after the close of testimony in the case is a matter resting within its discretion. *State* v. *Levy*, 103 Conn. 138, 145, 130 Atl. 96 [1925]; *State* v. *Chapman*, 103 Conn. 453, 479, 130 Atl. 899 [1925]; *King* v. *Spencer*, 115 Conn. 201, 203, 161 Atl. 103 [1932]; *State* v. *Swift*, 125 Conn. 399, 405, 6 A.2d 359 [1939]. *Hauser* v. *Fairfield*, 126 Conn. 240, 242, 10 Atl. (2d) 689 [1940]. In the ordinary situation where a trial court feels that, by inadvertence or mistake, there has been a failure to introduce available evidence upon a material issue in the case of such a nature that in its absence there is serious danger of a miscarriage of justice, it may properly permit that evidence to be introduced at any time before the case has been decided. . . . *State* v. *Holmquist*, 173 Conn. 140, 152, 376 A.2d 1111, cert. denied, 434 U.S. 906, 98 S. Ct. 306, 54 L. Ed. 2d 193 (1977)." (Internal quotation marks omitted.) *Doe* v. *Doe*, 244 Conn. 403, 421, 710 A.2d 1297 (1998). The same principles apply to a request to offer evidence after a decision has been rendered. *Stocking* v. *Ives*, 156 Conn. 70, 72, 238 A.2d 421 (1968). The trial court abused its discretion in denying the defendants' motion.

First, the documents offered by the defendants, which were attached to the motion,[23] conclusively demonstrate that it was impossible for voting machine number 107017 to have been out of paper "since at least 8:30 a.m.," as the trial court had found. Other evidence in the case established that, when the machine was

---

[23] In opposing the motion in the trial court, the plaintiff did not contest the authenticity or accuracy of the documents, and has not done so in this appeal. The documents on their face demonstrate their authenticity. We therefore consider them as authentic and accurate.

taken out of service at 6:30 p.m., the plaintiff had received 115 write-in votes on that machine. The documents that the defendants offered were the official tally sheets for each voting machine used in the election. They constituted the official record, taken from the counting mechanism of each machine, of the number of electors who had entered that machine to vote on an hour-by-hour basis. These documents establish that: as of 8 a.m., 52 electors had entered that machine; as of 9 a.m., 80 electors had entered that machine; and as of 10 a.m., only 109 electors had entered that machine. Thus, it is simply impossible for this machine to have been out of paper for the purpose of recording write-in votes at 8:30 a.m., and also to have recorded 115 write-in votes for the plaintiff as of 6:30 p.m.[24]

Second, the caution with which a court should approach the decision of whether to order a new election strongly suggests that the trial court should have entertained the proffered evidence, notwithstanding its lateness. Appropriate judicial respect for the election process requires that, when the two factors of accuracy and speed conflict, it is better for the court to be correct on its facts than to be prompt and final in its decision. These documents conclusively establish that the trial court was incorrect in at least one of its critical factual findings.

---

[24] The fatal frailty of the trial court's finding in this regard is further demonstrated by a comparison of the total number of write-in votes cast for the plaintiff on voting machine number 107017 and on the other machines. As we have indicated, 115 electors cast their write-in votes for the plaintiff on that machine. The range of write-in votes for the plaintiff on the other machines—excluding voting machine number 143719, which was taken out of service early in the voting hours, at 6:50 a.m., with one such vote cast—was from a low of 79 on voting machine number 106949, which was taken out of service at 4:45 p.m., to a high of 137 on voting machine number 76264, and included totals of 90, 105, 110, 112, 115 and 123. It is wholly improbable, therefore, that 115 write-in votes would have been cast for the plaintiff by 8:30 a.m. on that one machine, and none thereafter, while the other machines in service throughout most or all of the day recorded a range of similar totals for the plaintiff.

Third, there was no special need for speed and finality in this case at the time that the evidence was offered. Only six days had elapsed since the trial court's decision ordering a new election for June 22, 1999, nearly one month away. Furthermore, there was nothing magical about that date for the new election. No critical interests would have been undermined had the proffered evidence required some further delay in the ultimate decision and, consequently, in a postponed new election date. We consider the merits of this appeal, therefore, shorn of the trial court's finding that voting machine number 107017 was out of paper for purposes of recording write-in votes for the plaintiff since 8:30 a.m.

IV

The defendants also claim that the trial court improperly concluded that there had been an erroneous ruling or rulings by an election official or officials within the meaning of § 9-328. We agree.

We have not heretofore defined the meaning of "rulings of the election official" as used in § 9-328. Moreover, neither § 9-328 nor any of the closely associated election statutes defines that phrase, nor does any of the legislative history of § 9-328 give any indication that it was intended to have some specialized meaning. We may presume, therefore, that the legislature intended it to have its ordinary meaning in the English language, as gleaned from the context of its use.

The dictionaries of the English language constitute compendiums of the commonly accepted meanings of words, depending on their contexts. Those dictionaries offer the following consistent meanings of the word "ruling," when it is used in the context of an act of a governmental official. A "ruling," according to Webster's Third New International Dictionary (1971), is "an official or authoritative decision, decree, or statement . . . a decision or rule of a judge or a court . . . an

interpretation by an administrative agency of the law under which it operates applicable to a given statement of facts . . . ." Similarly, The American Heritage Dictionary of the English Language (1969) defines a "ruling" as an "authoritative or official decision." In addition, Black's Law Dictionary (6th Ed. 1990), which may be considered as a compendium of the accepted usages of words in the law, depending on their contexts, defines a "ruling," consistently with the nonlegal dictionaries, as "[a] judicial or administrative interpretation of a provision of a statute, order, regulation, or ordinance . . . ."

The common thread of these definitions is that, at the least, a ruling of an election official must involve some act or conduct by the official that (1) decides a question presented to the official, or (2) interprets some statute, regulation or other authoritative legal requirement, applicable to the election process. Given that common thread, and given the notion that we should not interpret § 9-328 beyond its narrowly defined circumstances and its limited types of claims, we conclude that the phrase "rulings of the election official" as used in § 9-328 has that meaning. Moreover, there must be an *"error* in the rulings of the election official" in order to supply a basis for a new election under § 9-328. (Emphasis added.) To summarize, therefore: as one of the statutory predicates of a judicial order for a new election under § 9-328, namely, "error in the rulings of the election official," election officials must have engaged in conduct that incorrectly either (1) decided a question presented to them applicable to the election process, or (2) interpreted some statute, regulation or other authoritative legal statement or requirement applicable to that process. Applying that definition, we conclude that the trial court's determination that there were erroneous rulings of election officials cannot stand.

The trial court determined that the errors in the rulings of election officials were "that election officials in a de facto manner ruled throughout the day that they did not need to continue to inspect the voting machines in use in order to ensure that there were not problems with the mechanics, in particular of the write-in votes . . . ." Thus, in the view of the trial court, the election officials' failure throughout the day to continue to inspect the voting machines in use for the purpose of ensuring that there were not mechanical problems with those machines, constituted an erroneous ruling.[25]

Such a failure, if it existed, however, did not constitute an erroneous ruling. It did not decide, either explicitly or implicitly, a question presented to the election officials regarding the election process, and it did not interpret any statute, regulation or other authoritative legal statement or requirement applicable to that process. It cannot be regarded as anything more than the exercise of election day discretion regarding the proper mechanical functioning of the voting machines, a subject that is committed in the first instance to the authority of the election officials. Given the broad and plenary powers of those officials under our statutes generally, and given the narrow and circumscribed bases for judicial intervention under § 9-328, the exercise of that discretion must be given a wide berth. Although judicial hindsight regarding whether that discretion was properly exercised might in an extreme case provide the

[25] That this was a basis of the trial court's determination that there had been erroneous rulings by the election officials is reinforced by the following passage in the court's memorandum decision: "The paper was not advancing on [voting] machine number 143719. The decision at that point was to take that machine out of service and replace it, but that issue that early in the day affecting certainly one candidate more than others—in other words, there was only one candidate that depended on paper at that point or that kind of paper—it seems to me should have served as some sort of notice to the election officials that scrutiny of the mechanics of all of the machines needed to be undertaken throughout the day with some care."

basis for a conclusion that votes were miscounted, it cannot convert its exercise into a ruling by the officials.

The plaintiff's reliance on *Wrinn* v. *Dunleavy*, supra, 186 Conn. 138–39, is misplaced. In that case, the election officials improperly counted twenty-six absentee ballots that were invalid because they had been improperly mailed. Id., 130. We held that the "ruling" was the counting of those improper ballots. Id., 139. In that case, however, by counting those invalid ballots, the election officials implicitly had interpreted the provisions of General Statutes § 9-146 regarding the casting and mailing of absentee ballots. See id., 145. Thus, *Wrinn* does not, as the plaintiff's argument suggests, stand for the proposition that any act or failure to act by election officials that is relevant to the election process will suffice as a "ruling" within the meaning of § 9-328. Cf. *In re Election for Second Congressional District*, supra, 231 Conn. 607 (election officials ruled, on recanvass, that absentee ballot envelopes not originally opened should be opened and ballots counted); see also *Lobsenz* v. *Davidoff*, supra, 182 Conn. 13 (interpretation of minority representation statutes by election moderator constituted ruling by that official). Indeed, such a suggestion is foreclosed by our decision in *Scheyd* v. *Bezrucik*, supra, 205 Conn. 503, wherein we stated: "[T]he review provided by [General Statutes] § 9-325 is available only when the original complaint actually states a cause of action cognizable under [General Statutes] §§ 9-324, 9-328, or 9-329a. Such a complaint must concern a ruling of an election official or a mistake in the count of votes. . . . A plaintiff may not use these sections to challenge a law or regulation under which the election or primary election is held by claiming aggrievement in the election official's obedience to the law. In such a case the plaintiff may well be aggrieved by the law or regulation, but he or she is not aggrieved by the election official's rulings which are in conformity

with the law." (Citation omitted; internal quotation marks omitted.)

V

Erroneous rulings by election officials do not, however, constitute the only predicate for a judicial order for a new election under § 9-328. The other predicate is that there was a "mistake in the count of the votes." The trial court determined that there was such a mistake. We next address, therefore, the propriety of that determination and whether it justified a new election.

The basis for that determination by the trial court was that there were several voting machines that did not function properly in recording write-in votes for the plaintiff. Specifically, the court found that at 6:50 a.m., on voting machine number 143719, the paper for recording write-in votes was not advancing. It is undisputed, however, that, upon being informed of this problem and checking the complaint, the election officials took this machine out of service and replaced it with alternate voting machine number 76263. The court also found that voting machine number 150231 had a significant problem throughout the day. This problem included reports to election officials concerning this machine at 1:40 p.m., 2:50 p.m. and 3 p.m., with the first of these complaints involving "a perceived inability to cast a write-in vote" for the plaintiff. The court also found that at 3 p.m., this machine was not checked despite a complaint concerning it, and that "[n]otwithstanding the evidence that the machine was checked . . . it never continued to function adequately." In addition, the court found that voting machine number 106949 had a paper jam at 4:45 p.m., and was then taken out of service. Finally, with respect to voting machine number 107017, shorn of the improper finding that we already have discussed, the court found that at 6:30

p.m. the machine had no paper for write-in candidates and was taken out of service.[26]

We agree with the plaintiff that a mechanical failure of a machine properly to record write-in votes may constitute a "mistake in the count of the votes," within the meaning of § 9-328.[27] We conclude, however, that these mistakes were not substantial, and that as a result of them the reliability of the result of the election was not placed seriously in doubt.

Voting machine number 143719 was taken out of service at 6:50 a.m., less than one hour after the polls had opened, because it was discovered that the write-in paper was not advancing properly. The evidence regarding this event was that, as a result of that mechanical

---

[26] When we inquired at oral argument before this court, the parties could not explain to us how a voting machine could have "no paper" for purposes of recording write-in votes. It is undisputed that, mechanically, the write-in process takes place as follows. In the back of the machine there is a continuous roll of paper on which such votes are recorded. It is undisputed that each machine was equipped with such a roll of paper. When a voter wished to cast a write-in vote, he lifted a metal slot cover, causing the paper behind the cover to advance to, presumably, a blank place on the roll. He then wrote in the name of the candidate, and closed the slot cover. Given this mechanism, we were able to understand how a machine, because of a malfunction, could fail to advance the paper to a blank place. It was difficult to understand, however, how there could be *no* paper behind the metal slot cover. The transcript discloses, however, that, when the election officials discovered, with respect to a particular machine, that there was "no paper" behind the slot cover, they assumed that there was a paper jam that had produced that circumstance. This may account for the mechanical conundrum of "no paper" where there is a continuous roll of paper. In any event, the defendants have not raised this apparent conundrum as a ground of appeal.

[27] We reject, therefore, the defendants' argument that the statutory language only covers a situation in which votes that were cast were improperly counted, but does not cover a situation in which votes were *not* cast, for whatever reason. First, the statutory language is broad enough to cover both situations. If otherwise validly cast ballots were not counted, the resulting total number of votes for each candidate may be regarded as a "mistake in the count of the votes." Second, one of the purposes of the statute, namely, to ensure accuracy in the election process, suggests the broader interpretation.

failure, two write-in votes were lost. There was no evidence, however, and it could not be determined, whether either or both of those write-in votes were for the plaintiff or for the write-in candidate for the regional board of education. Thus, any factual finding that these two lost votes harmed the plaintiff would rest on nothing more than speculation.

The evidence regarding voting machine number 150231 was as follows. At 1:40 p.m., there was a complaint regarding write-in votes, namely, that the paper was not advancing properly. The election officials entered the machine, tested the write-in mechanism, determined that the paper was advancing properly, initialed the paper, and left the machine in service. At that time, it also was discovered that one vote for the plaintiff had been crossed out. The significance of that cross-out was not explained. There is no basis in the evidence, however, for an inference that any mechanical failure of the machine could have crossed out a vote that had been cast for the plaintiff.[28] At 2:50 p.m., there was another complaint about the write-in mechanism of this machine. The record indicates that the public counter on the machine was off by two digits.[29] The record also indicates, however, that the election

[28] In this connection, the trial court found that "[t]he moderator of the election specifically recalls that the first of [the complaints regarding voting machine number 150231] had to do with a perceived inability to cast a write-in vote for [the plaintiff]; that is not specifically recorded by her but I credit her testimony in that regard." The transcript indicates, however, that the moderator simply acknowledged that line five, the line with the crossed out vote, was one of the two lines on which an elector could have voted for the plaintiff. We have examined fully the testimony of Mary Lou Winnick, the moderator of the election, and can find no other testimony regarding her recollection of a perceived inability by an elector to vote for the plaintiff. We therefore disregard that portion of the finding.

[29] This meant that there was a discrepancy of two between the total number of electors who had entered the machine, and the total number of votes cast on the machine. The evidence indicates a number of reasons unconnected with any malfunction of the write-in mechanism that would account for such a discrepancy, such as an official entering the machine to check its functioning. On the basis of the evidence in the record, it would

officials entered the machine and determined that the mechanism was working properly. There also was evidence that at 3 p.m., there was another complaint about the write-in mechanism, but the election officials did not check the machine at that time. In addition, there was undisputed evidence that this machine was checked twice at 6:35 p.m., and found to be functioning properly.

This evidence simply is inadequate to support a finding that this machine "never continued to function adequately." The evidence amounts to three complaints, two of which were determined by the election officials at the scene to have been unfounded, and a third complaint that, for unexplained reasons, was not pursued, all in a fourteen hour period of voting. In addition, the voting records indicate a total of 110 write-in votes cast for the plaintiff on this machine, which is fully consistent with the spectrum of such votes cast for the plaintiff on all of the other machines.[30] It is wholly improbable that a machine that never functioned adequately with respect to recording write-in votes, nonetheless, would have registered a number of votes that was so close to the numbers registered by the other machines that were functioning adequately for all or most of the day.

be speculative to infer that this discrepancy was connected to lost votes for the plaintiff.

[30] Those records indicate the following votes for the plaintiff on the other voting machines: (1) 1 vote on voting machine number 143719, which was taken out of service at 6:50 a.m.; (2) 79 votes on voting machine number 106949, which was taken out of service at 4:45 p.m.; (3) 90 votes on voting machine number 76263, which was in service from 6:50 a.m. until 8 p.m.; (4) 105 votes on voting machine number 76265, which was in service all day; (5) 115 votes on voting machine number 107017, which was taken out of service at 6:30 p.m.; (6) 123 votes on voting machine number 161427, which was in service all day; (7) 112 votes on voting machine number 160117, which was in service all day; and (8) 137 votes on voting machine number 76264, which was in service all day.

The evidence regarding voting machine number 106949 was that at 4:45 p.m., its paper jammed and it was taken out of service. There was no evidence of any malfunctioning of the write-in mechanism before that time. Although there was evidence that when the write-in paper was removed from the machine at the end of the voting day it was partially torn vertically, the evidence was also that seventy-nine write-in votes had been recorded on that machine throughout the day. Moreover, this number of write-in votes was consistent with the numbers recorded on the other machines, given that this machine was in service for only eleven of the fourteen voting hours.

Finally, the evidence regarding voting machine number 107017 was that at 6:30 p.m., in response to a complaint, its write-in mechanism was found not to be functioning properly, and it was then taken out of service. Moreover, by that time 115 write-in votes had been cast for the plaintiff on this machine.

There also was evidence that, prior to that time, three voters were unsuccessful, because of a mechanical malfunction, in casting their write-in votes for the plaintiff on that machine. Elizabeth Phillips Marsh testified that at approximately 8:15 a.m., she lifted the slot cover and wrote the plaintiff's name on metal, not paper. Jean Bortner, the plaintiff's wife, testified that at approximately 9 a.m., she lifted the slot cover and wrote the plaintiff's name on what appeared to be metal or clear computer-type paper, not white paper. Michelle Greengarden testified that at approximately 4 p.m., she lifted the slot cover and wrote the plaintiff's name on metal, not paper. Neither Marsh, Bortner nor Greengarden, however, reported her difficulty to any election official.

The sum of this evidence, therefore, was that of the total of nine voting machines in use during the election,

three were taken out of service at some point, and one was questioned three times. Although these facts, considered alone, might give rise to a conclusion that there were substantial mistakes in the count of the votes, that conclusion is not justified when the facts are analyzed more closely.

First, one of the three machines was taken out of service less than one hour into the voting day, and there is no evidence that it contributed to any identifiable mistake in the count of the votes for the plaintiff. Second, two of the three complaints on the questioned machine were found to be unfounded, and it was checked twice thereafter and found to be working properly. Third, one machine was not questioned until 4:45 p.m., when it was promptly taken out of service. There is no evidence that, prior to that time, it contributed to any identifiable mistake in the count of the votes for the plaintiff. Fourth, one machine was taken out of service at 6:30 p.m. The only evidence that this machine contributed to identifiable mistakes in the count of votes for the plaintiff was that it did not record the votes of three voters, who did not at any time register complaints with the election officials when those complaints could have been addressed. Furthermore, the undisputed evidence regarding all of the machines in question was that they registered total numbers of write-in votes that were consistent with the numbers registered on the machines that were never questioned. There was no basis, therefore, for an inference that these particular malfunctions were a surrogate for other, unidentified malfunctions of the process of write-in votes for the plaintiff, either on the machines in question or on the other machines in use during the election. Applying our plenary scope of review to this evidence, therefore, we conclude that it falls short of establishing substantial mistakes in the count of the votes in the election.

We also conclude that even if we were to regard these mistakes in the count as substantial, the evidence falls short of establishing that those mistakes rendered the reliability of the result of the election, as reported by the election officials, seriously in doubt. The margin between the plaintiff and Greene was fifty-six votes. Giving the plaintiff the full benefit of any mistakes in the count established by the evidence, we cannot conclude that those mistakes would have brought the plaintiff's number of votes significantly closer to that of Greene so as to cast doubt on the reliability of the result of the election.

The judgment is reversed and the case is remanded with direction to render judgment for the defendants.

In this opinion CALLAHAN, C. J., and NORCOTT and KATZ, Js., concurred.

BERDON, J., concurring. I agree with my colleagues in the majority that the trial court should order a new election pursuant to General Statutes § 9-328 only when the following two criteria have been satisfied: (1) the party challenging the election has proven that it is more likely than not that "there were substantial violations of the requirements of [§ 9-328] . . . and (2) as a result of those violations, the reliability of the result of the election is seriously in doubt." I also agree that the ultimate determination of whether these criteria have been satisfied "is a mixed question of fact and law that is subject to plenary review on appeal." Applying this analytic framework to the facts before us, I join my colleagues in the majority in holding that the trial court in the present case improperly ordered a new election. I write separately for two reasons.

First, I believe that part I of the majority opinion is dangerously misleading, and I write to set the record straight. The text of § 9-328 authorizes a trial court to order a new election if it "finds *any error* in the rulings

of the election official or *any mistake* in the count of the votes . . . ." (Emphasis added.) I fear that the lopsided tone of part I of the majority opinion will intimidate trial courts and deter them from vacating elections that do not embody the will of the people. Although the majority is certainly correct to emphasize that "all of the electors who voted at [an] officially designated election . . . have a powerful interest in the *stability* of that election," the voters have an even more powerful interest in the integrity and the accuracy of that election. (Emphasis added.) Pursuant to the legislative mandate contained in § 9-328, it is the duty of the trial court to elevate integrity and accuracy over stability. To the extent that the majority opinion contains innuendo to the contrary, it should be disregarded.

I also write separately in order to take several steps back from the facts of the controversy that is presently before us. In the context of § 9-328, the majority adopts a plenary standard of review, pursuant to which we do not defer to the trial court's determination regarding the integrity and accuracy of an election. Viewed in isolation, this is a perfectly sensible decision; indeed, it is one that I join without reservation. Viewed alongside other recent decisions, however, it makes absolutely no sense.

The majority correctly observes that "the question of whether to give . . . a trial court deferential or plenary review is really a question of judicial policy." As a matter of judicial policy, I agree that vacating an election is serious business, and that we should scrutinize rigorously a trial court's determination that it is appropriate to do so. I also believe, however, that we should scrutinize rigorously other judicial rulings that implicate fundamental rights under the constitution. My colleagues in the majority disagree with me, for reasons that they are unable to explain to my satisfaction.

I will limit myself to a single, illustrative example. "The conventional wisdom among African-Americans and other minorities is that they are not treated fairly throughout the judicial system because of their race. To put it plainly, minorities believe that the judicial system is stacked against them. This perception is heightened when the state eliminates minorities from juries by exercising peremptory challenges based upon the race of venirepersons. The United States Supreme Court recognized this fact when it stated: '[W]e have not questioned the premise that racial discrimination in the qualification or selection of jurors offends the dignity of persons and the integrity of the courts. Despite the clarity of [constitutional] commands to eliminate the taint of racial discrimination in the administration of justice, allegations of bias in the jury selection process persist.'[1] *Powers* v. *Ohio*, 499 U.S. 400, 402, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991)." *State* v. *Hodge*, 248 Conn. 207, 269–70, 726 A.2d 531 (1999) (*Berdon, J.*, dissenting).

Oblivious to the perception of injustice along the vector of race, the majority of this court has determined that—as a matter of judicial policy—it will review *Batson/Holloway* claims[2] with "great deference," and will not disturb a trial court's ruling "unless it is clearly

[1] "[T]his court and the Appellate Court have reviewed claims of purposeful discrimination in the exercise of peremptory challenges in [twenty] cases. Neither court, however, has ever found impermissible discrimination in the exercise of a peremptory challenge, a statistical fact that lends credence to the public perception that our judicial system fosters discrimination." *State* v. *Hodge*, 248 Conn. 207, 272–73, 726 A.2d 531 (1999) (*Berdon, J.*, dissenting); see *State* v. *King*, 249 Conn. 645, 691 n.2, 735 A.2d 267 (1999) (*Berdon, J.*, dissenting).

[2] By raising a *Batson/Holloway* claim, the defendant asserts that the trial court improperly permitted the state to exclude a venireperson from the jury on the basis of race. See *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), as modified by state law in *State* v. *Holloway*, 209 Conn. 636, 645–46, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989).

erroneous." Id., 224. In the present case, however, the majority has decided to scrutinize rigorously the trial court's ruling, pursuant to the robust standard of plenary review. Apparently, my colleagues in the majority believe that a new election for the Woodbridge elementary school is more important than the perception among African-Americans that the overwhelmingly white legal system—which once enforced and legitimized both slavery and segregation—continues to discriminate against them. I am simply bewildered.