******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

THOMAS ARRAS ET AL. *v.* REGIONAL SCHOOL
DISTRICT NUMBER 14 ET AL.
(SC 19442)

Rogers, C. J., and Palmer, Zarella, Eveleigh, Espinosa, Robinson and
Vertefeuille, Js.

*Argued May 19—officially released October 20, 2015*

*Deborah G. Stevenson*, for the appellants (plaintiffs).

*Mark J. Sommaruga*, with whom were *William Stevens*, *Anthony F. DiPentima* and, on the brief, *Zachary D. Schurin*, for the appellees (defendants).

*Patrice A. McCarthy* filed a brief for the Connecticut Association of Boards of Education as amicus curiae.

*Opinion*

VERTEFEUILLE, J. The primary question that we must answer in this appeal is whether the failure to comply with the provisions of General Statutes §§ 10-56,[1] 10-47c[2] and 9-226[3] requiring towns to publish warning of a referendum in the same manner as provided for the election of town officials is prejudicial per se, automatically requiring the invalidation of the referendum results. The plaintiffs[4] brought this action against the defendants[5] alleging that the defendant towns of Woodbury and Bethlehem had held a referendum on the question of whether to approve a resolution by the defendant Board of Education for Regional School District Number 14 (board of education) authorizing the issuance of bonds and notes to finance certain school construction expenses, without issuing the statutorily required warning. The plaintiffs contended, among other things, that this failure rendered the referendum null and void ab initio. The defendants filed motions to strike certain of the plaintiffs' claims, which the trial court granted in part. Both the plaintiffs and the defendants then filed motions for summary judgment as to the remaining claims. The trial court concluded that there was no genuine issue of material fact as to whether the defendants had substantially complied with the statutory notice provisions and that there was no evidence that their failure to properly warn of the referendum had affected the vote. Accordingly, the trial court denied the plaintiffs' motion for summary judgment, granted the defendants' motions for summary judgment and rendered judgment for the defendants. The plaintiffs appeal[6] from the judgment of the trial court claiming that the court improperly granted the defendants' motions for summary judgment because the failure to comply with the statutory notice provisions was inherently prejudicial. We affirm the judgment of the trial court, albeit on the basis of somewhat different reasoning.

The record reveals the following undisputed facts. On May 16, 2013, the board of education held a special meeting at which it approved a resolution appropriating $63,820,605 for the renovation of and additions to Nonnewaug High School and authorized the issuance of bonds and notes in the same amount to finance the appropriation. The board of education also approved resolutions recommending to the towns within the defendant Regional School District Number 14 (regional school district), namely, the towns of Woodbury and Bethlehem, that they subject the bond and note authorization to a referendum vote, to be held on June 18, 2013, on the following question: "Shall [the regional school district] appropriate $63,820,605 for renovations of and additions to Nonnewaug High School, and authorize the issu[ance] of bonds and notes in the same amount to finance the appropriation?"

On May 17, 2013, Debra W. Carlton, the executive assistant to the superintendent of the regional school district, forwarded the draft minutes of the May 16, 2013 special meeting of the board of education and a document entitled "Voting Machine Information" setting forth the approved ballot question to the town clerks of Woodbury and Bethlehem.[7] The town clerks never arranged for any notice of the referendum to be published in a newspaper of general circulation in the towns, as required by §§ 10-56, 10-47c and 9-226.[8]

On June 4, 2013, however, the Woodbury registrar of voters issued a news release regarding the referendum.[9] A newspaper, Voices, which has a circulation of 1360 in Bethlehem and 3338 in Woodbury, published an article about the referendum on June 12, 2013. The article provided the information that had been set forth in the news release and provided contact information for the town clerks and registrars of voters in both Bethlehem and Woodbury. Voices also had published an article about the school renovations and referring to the referendum on May 22, 2013. In addition, the Waterbury Republican American published articles on May 27, 2013, and on June 10, 2013. Another newspaper, the Sunday Republican, published an article on June 16, 2013, in which it described the renovations and referred to the June 18, 2013 referendum. On June 17, 2013, an online news service known as the Woodbury-Middlebury Patch also published an item describing the renovations and stating that the referendum would be held the following day.

The regional school district also made efforts to publicize the referendum. Specifically, at some point before June 18, 2013, the regional school district mailed notices about the school renovations and proposed referendum to all residents of the towns of Woodbury and Bethlehem and posted information about the referendum on its website. The regional school district also used a "robocalling" system to call voters by telephone to notify them of the date, time and voting places for the referendum.[10]

The referendum was held on June 18, 2013, and the voters approved the referendum question by a vote of 1269 to 1265. Thereafter, the Woodbury and Bethlehem town clerks refused to certify the referendum results to the Commissioner of Education because there had been no proper legal warning of the referendum pursuant to §§ 10-56, 10-47c and 9-226. This uncertainty regarding the validity of the referendum results spawned two separate actions. Specifically, the towns of Bethlehem and Woodbury brought an action against the regional school district in the Superior Court for the judicial district of Litchfield (Litchfield action) seeking, inter alia, a declaratory judgment as to whether the results of the referendum were valid. The regional school district filed a counterclaim in the Litchfield

action seeking a declaratory judgment that the referendum results were valid and the issuance of a writ of mandamus ordering the respective town clerks to certify the results of the referendum. In addition to the Litchfield action, the plaintiffs filed the present action in the judicial district of Waterbury alleging that the defendants had failed to provide proper legal notice of the referendum and seeking the invalidation of the referendum results.[11] The trial court in the present action stayed the proceedings pending resolution of the Litchfield action.

The plaintiffs in the present case filed an appearance in the Litchfield action for the limited purpose of seeking to consolidate the two cases. They refused, however, to be made parties to the Litchfield action, despite their claim to the trial court in the present case that the Litchfield action was void ab initio,[12] and despite the warnings of the trial court that, if the plaintiffs failed to raise that claim in the Litchfield action, the claim might be "lost." On December 10, 2013, the trial court in the Litchfield action rendered judgment for the regional school district. The court concluded that "there [was] no evidence that the failure to strictly comply with the [statutory] notice requirement, by publishing an official 'warning' in the newspapers, was substantial or caused the results of the referendum to be seriously in doubt."

Meanwhile, in the present case, the plaintiffs had filed a motion for summary judgment. After the trial court in the Litchfield action rendered its decision, the defendants in the present case filed cross motions for summary judgment.[13] Relying on the reasoning of the trial court's decision in the Litchfield action, the trial court in the present case concluded that there was no genuine issue of material fact as to whether the defendants had substantially complied with the warning provisions of §§ 10-56, 10-47c and 9-226 by publicizing the referendum in various ways and there was also no evidence that the defendants' failure to strictly comply with the statutes had affected the outcome of the referendum vote. Accordingly, the trial court granted the defendants' motions for summary judgment and rendered judgment for the defendants.

This appeal followed.[14] The plaintiffs claim on appeal that the trial court improperly rendered summary judgment for the defendants[15] because the failure to strictly comply with the warning provisions of §§ 10-56, 10-47c and 9-226 was prejudicial per se.[16] The defendants respond that the trial court properly granted their motions for summary judgment because there was no genuine issue of material fact as to whether there had been substantial compliance with the statutory notice provisions and there was no evidence that the failure to comply strictly with the statutes caused the results of the referendum to be seriously in doubt. For the reasons that follow, we agree with the defendants that

the trial court properly granted their motions for summary judgment because there was no evidence that the referendum results were affected by the lack of a proper warning.

The principles that govern our review of a trial court's ruling on a motion for summary judgment are well established. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary." (Internal quotation marks omitted.) *Rocco* v. *Garrison*, 268 Conn. 541, 548–49, 848 A.2d 352 (2004).

Before addressing the merits of the plaintiffs' claims, we set forth the general principles governing our limited review of claims involving the validity of election results. "First, under our democratic form of government, an election is the paradigm of the democratic process designed to ascertain and implement the will of the people. . . . The purpose of the election statutes is to ensure the true and most accurate count possible of the votes for the candidates in the election [or, as in the present case, for a particular referendum result]. . . . Those statutes rest on the bedrock principle that the purpose of the voting process is to ascertain the intent of the voters. . . . In implementing that process, moreover, when an individual ballot is questioned, no voter is to be disfranchised on a doubtful construction, and statutes tending to limit the exercise of the ballot should be liberally construed in his [or her] favor. . . . Our election laws, moreover, generally vest the primary responsibility for ascertaining that intent and will on the election officials, subject, of course, to the court's appropriate scope of review when the officials' determination is challenged in a judicial proceeding. . . . We look, therefore, first and foremost to the election officials to manage the election process so that the will of the people is carried out." (Citations omitted; internal quotation marks omitted.) *Bortner* v. *Woodbridge*, 250 Conn. 241, 254, 736 A.2d 104 (1999). "Second . . . [t]he delicacy of judicial intrusion into the electoral process . . . strongly suggests caution in undertaking such an intrusion." (Citation omitted; internal quotation marks omitted.) Id.

"An election is essentially—and necessarily—a snapshot. It is preceded by a particular election campaign,

for a particular period of time, which culminates on a particular date, namely, the officially designated election day. In that campaign, the various parties and candidates presumably concentrate their resources—financial, political and personal—on producing a victory on that date. When that date comes, the election records the votes of those electors, and only those electors, who were available to and took the opportunity to vote—whether by machine lever, write-in or absentee ballot—on that particular day. Those electors, moreover, ordinarily are motivated by a complex combination of personal and political factors that may result in particular combinations of votes for the various candidates [or, as in the present case, for or against a referendum question] . . . .

"The snapshot captures, therefore, only the results of the election conducted on the officially designated election day. It reflects the will of the people as recorded on that particular day, after that particular campaign, and as expressed by the electors who voted on that day. Those results, however, although in fact reflecting the will of the people as expressed on that day and no other, under our democratic electoral system operate nonetheless to vest power in the elected candidates for the duration of their terms [or, as in the present case, to finally determine the will of the people on a referendum question]. . . . No losing candidate [or group of persons interested in a particular referendum result] is entitled to the electoral equivalent of a mulligan.

"Moreover, that snapshot can never be duplicated. The campaign, the resources available for it, the totality of the electors who voted in it, and their motivations, inevitably will be different a second time around. Thus, when a court orders a *new* election, it is really ordering a *different* election. It is substituting a different snapshot of the electoral process from that taken by the voting electorate on the officially designated election day.

"Consequently, all of the electors who voted at the first, officially designated election . . . have a powerful interest in the stability of that election because the ordering of a new and different election would result in *their* election day disfranchisement. The ordering of a new and different election in effect disfranchises all of those who voted at the first election because their validly cast votes no longer count, and the second election can never duplicate the complex combination of conditions under which they cast their ballots.

"All of these reasons strongly suggest that, although a court undoubtedly has the power to order a new election . . . the court should exercise caution and restraint in deciding whether to do so. A proper judicial respect for the electoral process mandates no less." (Emphasis in original; footnote omitted; internal quotation marks omitted.) Id., 255–57. In light of these princi-

ples, this court concluded in *Bortner* that "in order for a court to overturn the results of an election and order a new election . . . the court must be persuaded that: (1) there were substantial violations of the requirements of the [governing statutes] . . . and (2) as a result of those violations, the reliability of the result of the election is seriously in doubt." Id., 258.

With this background in mind, we turn to the plaintiffs' claim in the present case that the trial court improperly determined that the defendants' failure to strictly comply with the statutory notice provisions by publishing an official warning of the referendum in the newspapers did not require the invalidation of the referendum. We begin our analysis with the language of the governing statutes. Pursuant to § 10-56 (a), a referendum on a regional school district's issuance of bonds "shall be conducted in accordance with the procedure provided in section 10-47c . . . ." Section 10-47c provides in relevant part that "[t]he warning of such referenda shall be published . . . in the same manner as is provided for the election of officers of a town." Pursuant to § 9-226, governing municipal elections, "[n]otice of an election of a city or borough shall be given by publishing a warning in a newspaper published within the limits of such city or borough, or having a general circulation therein, not more than fifteen nor less than five days previous to holding the election, which warning shall include notice of the time and the location of the polling place in such city or borough and, in cities and boroughs divided into voting districts, of the time and the location of the polling place in each district."

The plaintiffs contend that these statutes are mandatory and, therefore, the defendants' failure to strictly comply with them by publishing a warning in the legal notice section of a newspaper of general circulation rendered the referendum invalid. Cf. *Santiago* v. *State*, 261 Conn. 533, 543, 804 A.2d 801 (2002) (general rule requires strict compliance with mandatory statutory provisions); *State ex rel. Barnard* v. *Ambrogio*, 162 Conn. 491, 502, 294 A.2d 529 (1972) (agency's failure to comply with mandatory statutory provision renders agency's action invalid). This court held in *Bortner*, however, that the mere failure to comply with a statute governing a part of the election process does not automatically render the election invalid. See *Bortner* v. *Woodbridge*, supra, 250 Conn. 258 ("in order for a court to overturn the results of an election and order a new election . . . the court must be persuaded that: [1] there were *substantial* violations of the requirements of the [governing statutes] . . . and [2] as a result of those violations, the reliability of the result of the election *is seriously in doubt*" [emphasis added]); see also *Caruso* v. *Bridgeport*, 285 Conn. 618, 652, 941 A.2d 266 (2008) (even assuming validity of plaintiff's allegations that registrar of voters, poll workers and campaign workers had violated mandatory election statutes gov-

erning staffing of polling places, court was not required to order new election when plaintiff failed to prove that effect of violations "was to place the result of the election *seriously in doubt*" [emphasis in original]); *Caruso* v. *Bridgeport*, supra, 653 ("proof of irregularities in the [election] process is not sufficient to overturn an election in the absence of proof that any of the irregularities actually affected the result").

We recognize that *Bortner* and *Caruso* involved statutes that are not at issue in the present case. Specifically, *Bortner* involved General Statutes § 9-328, governing contests in elections for municipal officers, and this court's conclusion that strict compliance with election statutes was not required was based in part on the genealogy and legislative history of that statute. See *Bortner* v. *Woodbridge*, supra, 250 Conn. 260–63. *Caruso* involved General Statutes § 9-329a, governing contests in connection with primary elections. We note, however, that the language of General Statutes § 9-371b, governing complaints directed at the rulings of election officials in referenda, closely tracks the language of §§ 9-328 and 9-329a.[17] Moreover, § 9-371b was enacted in 2004; see Public Acts 2004, No. 04-117, § 4; after this court's decision in *Bortner* construing the provisions of § 9-329 was published. "The legislature is presumed to be aware of the interpretation which the courts have placed upon one of its legislative enactments . . . ." (Internal quotation marks omitted.) *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 297–98, 695 A.2d 1051 (1997). Accordingly, it is reasonable to conclude that, by using language in § 9-371b that is similar to the language of § 9-329, the legislature intended that § 9-371b would be given a similar interpretation.[18] Indeed, we can perceive no reason why the "general principles governing the judiciary's limited role in elections"; *Caruso* v. *Bridgeport*, supra, 285 Conn. 637; as described in *Bortner*, should not apply equally to referenda.[19] We therefore conclude that the failure to strictly comply with the statutory notice provisions does not automatically invalidate the result of a referendum conducted pursuant to § 10-56 (a). Rather, a referendum may be judicially invalidated only when: "(1) there were substantial violations of the requirements of the [governing statutes] . . . and (2) as a result of those violations, the reliability of the result of the election is seriously in doubt." *Bortner* v. *Woodbridge*, supra, 258.

We recognize that, as the dissent points out, there is authority from other jurisdictions to support the propositions that statutory notice provisions for special elections are more strictly applied than those for general elections,[20] and, at least when there has been a *complete* failure to comply with a statutory notice provision for a special election, actual notice cannot cure the noncompliance.[21] Several cases on which the dissent relies, however, predate the advent of television, not to mention robocalling, mass public signage, mass mailings,

the Internet and e-mail. Thus, these cases were decided at a time when it could be safely presumed that the officially prescribed notice was the primary, and perhaps the only, means by which voters could learn about elections, particularly special elections that are not held on a regularly scheduled basis. While we do not deny that, even today, there is a difference between a referendum and a regularly scheduled general election with respect to presumed notice, a referendum, no less than a general election for public officials, is a snapshot in time, and invalidation of the results will disenfranchise the voters who contributed to that snapshot by campaigning and voting for a particular result. Accordingly, the general democratic principles militating in favor of limited judicial intervention in elections unless the noncompliance with governing statutes placed the result of the election seriously in doubt should apply equally to referenda. Moreover, although the difference between special elections and general elections might justify applying different evidentiary standards to the two proceedings,[22] we can perceive no reason why the difference would justify depriving the relevant government officials of the *power* to conduct a special election when they have failed to comply with statutory notice provisions, which is essentially what the dissent is contending.

The dissent also contends that a conclusion that actual notice is sufficient to cure a total failure to comply with the statutory notice provisions usurps the role of the legislature, rewrites the governing statutes and violates fundamental democratic principles. The dissent does not dispute, however, that, when there has been only *partial* compliance with a statutory notice provision for a referendum, the reliability of a referendum result is the touchstone by which we should determine its validity, not whether there was technical compliance with governing statutes. Nor does the dissent dispute that this standard has its basis in the fundamental democratic principles underlying the election process. See 26 Am. Jur. 2d 82, Elections § 280 (2014) ("courts are reluctant to defeat a fair expression of the popular will in either a general or special election"). Accordingly, we can perceive no reason why *automatic* invalidation of a referendum should be required when there was *no* compliance with the statutory notice provisions, where, as in the present case, the evidence establishes that the voters had actual notice of the referendum and strict compliance would not have affected the outcome. Such a conclusion would be hypertechnical, and would exalt form over substance.[23] Of course, we strongly encourage public officials to comply *fully* with *all* statutes governing elections and referenda, not only because they have a duty to submit to the legislature's constitutional authority to determine how elections will be conducted, but also to foreclose even the possibility that the results of the referendum or election

will be judicially invalidated and to avoid the cost and inconvenience of defending actions like the present one. For the reasons that we have explained, however, we cannot conclude that the failure to comply fully with statutory notice provisions *automatically* invalidates the result. If the legislature disagrees with this conclusion, nothing prevents it from making its intention clear. See id., § 277, p. 80 ("[a] failure to comply with statutory-notice requirements will invalidate an election which has already been held only if it appears that it prevented the electors from obtaining a free and full expression of their will at the election *or if the statute contains a further provision voiding an election not held in accordance therewith*" [emphasis added]).

In support of their claim that strict compliance with the statutory notice provisions for elections is required, the plaintiffs rely on the decision of the United States Supreme Court in *Bloomfield* v. *Charter Oak Bank*, 121 U.S. 121, 7 S. Ct. 865, 30 L. Ed. 923 (1887). Specifically, the plaintiffs rely on the court's statement that "[a] town cannot make a contract, or authorize any officer or agent to make one in its behalf, except by vote in a town meeting duly notified or warned; and the notice or warning must specify the matter to be acted on, in order that all the inhabitants . . . may know in advance what business is to be transacted at the meeting. If the subject of the vote is not specified in the notice or warning, the vote has no legal effect, and binds neither the town nor the inhabitants. No one can rely upon a vote as giving him any rights against the town, without proving a sufficient notice or warning of the meeting at which the vote was passed." Id., 129–30. The plaintiffs contend that this language supports their position that the failure to provide the statutorily required warning for a referendum automatically renders the referendum results null and void. As the defendants point out, however, this court has held that a town meeting and a referendum are entirely distinct decision-making mechanisms. *Sadlowski* v. *Manchester*, 206 Conn. 579, 590, 538 A.2d 1052 (1988) ("[f]or us to imply such an equivalence [between town meetings and referenda] would fly in the face of reality"); id. ("a referendum in which individual voters cast individual ballots in individual voting booths does not constitute a town meeting").[24] Our limited role in reviewing challenges to the legality of the election process derives in large part from the "magnitude and complexity" of elections; *Caruso* v. *Bridgeport*, supra, 285 Conn. 653; and from the important democratic values underlying the essential and necessary nature of an election as a "snapshot" of "the will of the people as recorded on [a] particular day, after [a] particular campaign, and as expressed by the electors who voted on that day." *Bortner* v. *Woodbridge*, supra, 250 Conn. 256. These concerns carry far less weight with respect to town

meetings. Indeed, if a town meeting is conducted without proper legal notice, it places no great burden on the persons involved to publish proper notice and to conduct another meeting. In contrast, when an election or a referendum is invalidated, all of the enormous effort and expense that went into the official planning and public campaigns preceding the election or referendum are lost, and the persons who voted at the first election or referendum are disenfranchised. Accordingly, the decision of the United States Supreme Court in *Bloomfield* is of little persuasive value here.

The plaintiffs also rely on this court's holding in *State v. Lenarz*, 301 Conn. 417, 436–37, 22 A.3d 536 (2011), cert. denied,    U.S.   , 132 S. Ct. 1095, 181 L. Ed. 2d 977 (2012), that, in a criminal case, the disclosure to the prosecutor of defense materials containing information subject to the attorney-client privilege is inherently prejudicial.[25] We observed in *Lenarz*, however, both that (1) "[n]o severe definition of prejudice . . . could accommodate the [broad] sixth amendment policies" underlying the right to be represented by counsel; id., 434; and (2) that prejudice should be presumed under these circumstances because "it is highly unlikely that a court can . . . arrive at a certain conclusion as to how the government's knowledge of any part of the defense strategy might benefit the government . . . ." (Internal quotation marks omitted.) Id., 435. In contrast, in the present case, the democratic values underlying the election process militate in favor of *limited* judicial intervention in that process, and nothing prevented the plaintiffs from attempting to establish actual prejudice by identifying voters within the regional school district who would have voted against the referendum question if the referendum had been properly noticed, and submitting documentation to that effect in support of their opposition to the defendants' motion for summary judgment.[26] Accordingly, *Lenarz* has little application here.

Having rejected the plaintiffs' claim that the defendants' failure to comply with the notice provisions of the governing statutes automatically required the invalidation of the June 18, 2013 referendum, we turn to the questions of whether: "(1) there were substantial violations of the requirements of the [governing statutes] . . . and (2) as a result of those violations, the reliability of the result of the election is seriously in doubt." *Bortner* v. *Woodbridge*, supra, 250 Conn. 258. Because it is dispositive, we first address the question of whether the trial court properly determined that there was no genuine issue of material fact as to whether the results of the June 18, 2013 referendum were seriously in doubt as the result of the defendants' failure to properly warn the referendum pursuant to the applicable statutes. The trial court concluded that, in comparison with the actual efforts to publicize the referendum, as previously described in this opinion, compliance with the statutory notice requirement

"would have been merely nominal . . . ." (Internal quotation marks omitted.) In addition, the court noted that "the referendum had a greater turnout than those past referenda that took place with proper notice."[27] (Internal quotation marks omitted.) Finally, the trial court concluded that there was no evidence that "a single vote was lost or affected by [the defendants'] failure to publish a notice in strict compliance with the statute." (Internal quotation marks omitted.) The plaintiffs do not dispute any of these conclusions, but claim only that the defendants' failure to properly warn of the referendum in strict compliance with the applicable statutes was prejudicial per se, a claim that we have already rejected. Accordingly, we conclude that the plaintiffs have failed to meet their burden of establishing the existence of a genuine issue of material fact as to whether the defendants' failure to strictly comply with the warning provisions of §§ 10-56 (a), 10-47c and 9-226 caused the referendum results to be seriously in doubt.[28] See *Tuccio Development, Inc.* v. *Neumann*, 114 Conn. App. 123, 126, 968 A.2d 956 (2009) (after party who filed motion for summary judgment has established that there is no genuine issue of material fact, "the burden shifts to the party opposing such a motion [to] provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact" [internal quotation marks omitted]); see also *Caruso* v. *Bridgeport*, supra, 285 Conn. 652–53 (rejecting plaintiff's claim that irregularities in election process required new election when plaintiff failed to established that irregularities "had resulted in an improper vote, the improper counting of a vote or the improper failure to count a vote"); *Caruso* v. *Bridgeport*, supra, 653 ("[U]nder our system of government, the plaintiff bears the heavy burden of *proving* by a preponderance of the evidence that any irregularities in the election process actually, and seriously, undermined the reliability of the election results before the courts will overturn an election. Although we are mindful of the difficulties that plaintiffs face in meeting this burden in light of the statutory time constraints on election contests and the magnitude and complexity of the election process, our limited statutory role in that process and our need to exercise great caution when carrying out that role compel the conclusion that proof of irregularities in the process is not sufficient to overturn an election in the absence of proof that any of the irregularities actually affected the result." [Emphasis in original.]).

In reaching this conclusion, we are mindful that the referendum question passed by only four votes. As we have already indicated herein, however, nothing prevented the plaintiffs from attempting to prove actual prejudice by identifying persons who would have voted against the referendum if it had been properly noticed. Indeed, unlike in *Caruso*, time constraints on the plaintiffs' ability to investigate the prejudicial effect of the

defendants' failure to comply with the applicable statutes were not an issue here. There were approximately eleven months between the date that the plaintiffs filed their original complaint and the dates that the defendants filed their motions for summary judgment during which the plaintiffs could have conducted such an investigation. We therefore conclude that the trial court properly granted the defendants' motions for summary judgment.

The judgment is affirmed.

In this opinion PALMER, EVELEIGH and ESPINOSA, Js., concurred.

[1] General Statutes § 10-56 (a) provides in relevant part: "A regional school district shall be a body politic and corporate with power to sue and be sued; to purchase, receive, hold and convey real and personal property for school purposes; and to build, equip, purchase, rent, maintain or expand schools. Such district may issue bonds, notes or other obligations in the name and upon the full faith and credit of such district and the member towns to acquire land, prepare sites, purchase or erect buildings and equip the same for school purposes, if so authorized by referendum. Such referendum shall be conducted in accordance with the procedure provided in section 10-47c . . . ."

[2] General Statutes § 10-47c provides: "With the exception of the terms which pertain to the capital contribution of member towns, the transfer of property to the regional school district, the grades included, the size of the board of education and the representation of each town on the board and the towns to be served by the regional school district, the terms of the plan approved through referenda pursuant to section 10-45 may be amended as follows: If a regional board of education finds it advisable to amend the plan or if the legislative body of a town served by the regional board of education requests amendment of such plan, the regional board of education shall prepare a report on the proposed amendment, including the question to be presented, file a copy with the Commissioner of Education and the clerk of each member town and make copies of such report available to the public at a district meeting called to present the plan. After such public hearing, the board shall set the date for referenda which shall be held simultaneously in each member town between the hours of six a.m. and eight p.m. At least thirty days before the date of the referenda, the regional board of education shall notify the town clerk in each member town to call the referendum on the specified date to vote on the specified question. The warning of such referenda shall be published, the vote taken and the results thereof canvassed and declared in the same manner as is provided for the election of officers of a town. The town clerk of each town shall certify the vote of the town to the regional board of education and the Commissioner of Education. If the majority vote in each town of the district is in favor of the proposed amendment to the plan, such amendment shall take effect immediately."

[3] General Statutes § 9-226, governing municipal elections, provides in relevant part: "The town clerk in each town shall, in the warning for such election, give notice of the time and the location of the polling place in the town and, in towns divided into voting districts, of the time and the location of the polling place in each district. The town clerk shall record each such warning. Notice of an election of a city or borough shall be given by publishing a warning in a newspaper published within the limits of such city or borough, or having a general circulation therein, not more than fifteen nor less than five days previous to holding the election, which warning shall include notice of the time and the location of the polling place in such city or borough and, in cities and boroughs divided into voting districts, of the time and the location of the polling place in each district."

[4] The plaintiffs are Thomas Arras, Sean Murphy and Gary Suslavich, who are residents of the town of Woodbury, and Karen S. Miller and Peter T. Miller, who are residents of the town of Bethlehem.

[5] The defendants are Regional School District Number 14 (regional school district); Jody Ian Goeler, the superintendent of schools for the regional school district; the regional school district's board of education; John Chapman, the chairman of the board of education; George Bauer, the former

chairman of the board of education; the town of Woodbury; the town of Bethlehem; Gerald Stomski, first selectman of the town of Woodbury; and Jeffrey Hamel, first selectman of the town of Bethlehem.

[6] The plaintiffs appealed from the judgment of the trial court to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

[7] The text of the e-mail from the board of education to the town clerks provided: "Good morning, Town Clerks,

"The [b]oard of [e]ducation approved the ballot question and date of the building referendum at a special meeting last evening. Minutes are attached reflecting their actions and the ballot question is attached in the format you require.

"Please forward the ballot information to the registrars responsible for having ballots printed, and please let us know when absentee ballots will be available.

"Your assistance with this effort is most appreciated,

"Debra W. Carlton"

[8] After the failure to notice the referendum was brought to the attention of the Woodbury town clerk, Linda Carlson, she sent an e-mail to various persons involved in the matter stating that she had received no direction to notice and warn the referendum and that the town clerk's office "is '[a] keeper of [r]ecords,' we do not interpret [the board of education's] meeting minutes/motions." The defendant, Jody Ian Goeler, the superintendent of schools for the regional school district, had acknowledged in a previous e-mail that, "inadvertently, the reminder letter [to publish a warning] was not included with the ballot question and minutes calling for referendum" that had been sent to the town clerks.

[9] The news release provided: "NOTICE

"News Release—For Immediate Release—Reminder

"Please Publish ASAP

"Thank You

"The Region[al] 14 School [D]istrict in the town of Woodbury will be holding a referendum on whether the School District shall appropriate $63,820,605 for renovation of and additions to Nonnewaug High School, and authorize the issue of bonds and notes in the same amount to finance the appropriation.

"The referendum will be held on Tuesday, June 18, 2003, at the Woodbury Senior/Community Center, 265 Main Street South in Woodbury. All registered voters, as well as property taxpayers are eligible to vote in this referendum.

"The polls will be open from [6] a.m. until [8] p.m.

"Those seeking additional information may call the Registrar's office . . . or the Town Clerk's office . . . ."

[10] The defendants also submitted evidence of other attempts to publicize the referendum in support of their motions for summary judgment, including publicized tours of the high school building, discussion of the renovations and referendum at town board meetings and senior centers, the May 16, 2013 public hearing on the renovations that preceded the special meeting at which the referendum was approved by resolution, and prominent signage in the towns.

[11] The operative complaint alleged numerous state statutory violations (count one); various violations of the United States constitution (count two); various violations of the Connecticut constitution (count three); "[a]buse of [a]uthority" (count four); failure to provide proper legal notice of the referendum in violation of various state statutes and in violation of their civil rights under 42 U.S.C. § 1983 (count five); and violations of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110b et seq. (count six). The plaintiffs also sought injunctive relief (count seven). The trial court granted the defendants' motion to strike the operative complaint as to counts two, three, four and six, and the portion of count five alleging violations of 42 U.S.C. § 1983. In addition, the court granted the motion to strike as to paragraphs thirty-nine through forty-three and forty-eight of the first count containing the references to specific statutory violations. As a result, the only surviving portions of the complaint were the allegations in count one that the defendants had failed to provide proper legal notice of the referendum, certain paragraphs in count five alleging statutory and constitutional violations, and the request for injunctive relief in count seven. See footnote 25 of this opinion.

[12] The plaintiffs contended that the Litchfield action was void ab initio because the plaintiffs in that action had brought the action without the prior approval of the boards of selectmen of the respective towns.

[13] The following defendants; see footnote 5 of this opinion; filed a motion for summary judgment on June 10, 2014: the regional school district, Jody Ian Goeler, George Bauer and John Chapman. The remaining defendants, the towns of Woodbury and Bethlehem, Gerald Stomski, and Jeffrey Hamel filed a motion for summary judgment on June 24, 2014.

[14] After the appeal was filed, this court granted permission to the Connecticut Association of Boards of Education to file an amicus curiae brief in support of the defendants' position.

[15] As framed in their brief to this court, the plaintiffs' claim is that the trial court improperly denied their motion for summary judgment. The denial of a motion for summary judgment, however, is not an appealable final judgment. *Hopkins* v. *O'Connor*, 282 Conn. 821, 828, 925 A.2d 1030 (2007) ("[t]he denial of a motion for summary judgment ordinarily is an interlocutory ruling and, accordingly, is not a final judgment for purposes of appeal"). Nevertheless, because all of the plaintiffs' claims and arguments apply equally to the trial court's granting of the defendants' motions for summary judgment, and because the defendants make no claim that the plaintiffs' claims are not reviewable, we reframe the plaintiffs' claim as raising a challenge to the court's granting of the defendants' motions for summary judgment.

[16] The plaintiffs also contend that: (1) the trial court improperly relied on the reasoning of the trial court's decision in the Litchfield action because, according to the plaintiffs, the plaintiffs in the Litchfield action had no authority to bring the action and, therefore, it was "void ab initio"; and (2) the defendants in the present case "waived" any claim that they were entitled to summary judgment because they conceded that they had not complied with the provision of § 10-47c requiring that "warning of [a] referenda shall be published, the vote taken and the results thereof canvassed and declared in the same manner as is provided for the election of officers of a town." We note that the Appellate Court dismissed the plaintiffs' appeal from the judgment of the trial court in the Litchfield action, and the plaintiffs have not challenged that ruling. Because the plaintiffs have cited no authority for the proposition that the trial court in the present case was barred from relying on the reasoning of the trial court's decision in the Litchfield action, which is not the subject of any appeal or proper collateral attack, or for the proposition that the defendants in the present case waived all legal claims that could be raised in their motions for summary judgment by conceding an issue of material fact, we reject these claims. See *Rocco* v. *Garrison*, 268 Conn. 541, 548, 848 A.2d 352 (2004) ("[t]he party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that *the party is, therefore, entitled to judgment as a matter of law*" [emphasis added; internal quotation marks omitted]). Indeed, if the defendants had *disputed* the plaintiffs' factual claim that there had been no proper legal notice of the referendum, there would have been no basis for their claim in their motions for summary judgment that there was no genuine issue of material fact.

[17] The plaintiffs cited § 9-371b in the operative complaint. There is no indication in the record before us, however, that the plaintiffs invoked the notice or expedited hearing provisions of that statute. Rather, it appears that the plaintiffs proceeded in accordance with General Statutes § 9-7b (a) (9), which they also invoked in their complaint. See General Statutes § 9-7b (a) (9) (authorizing "a person who claims that he is aggrieved by a violation of any provision of chapter 152 or any other provision of the general statutes relating to referenda [to pursue] injunctive and any other ancillary equitable relief directly from the Superior Court by the filing of a complaint"). Nevertheless, the fact that the language of § 9-371b closely tracks the language of other statutes governing election contests supports the conclusion that the legislature intended that claims involving referenda would be subject to the same substantive standards as claims involving elections, regardless of the specific procedure by which such claims are brought.

[18] The legislative history of § 9-371b sheds no light on this question.

[19] Other courts also have held that the failure to strictly comply with the statutory notice requirement for an election or a referendum does not invalidate the election if there is no evidence that the failure to provide proper legal notice affected the result. See *Henard* v. *St. Francis Election Committee*, 301 Ark. 459, 461–62, 784 S.W.2d 598 (1990) ("[T]he failure to publish notice of an election is immaterial if the election is actually held and the electors have not been deprived of the opportunity to express themselves. [T]he voice of the people is not to be rejected for a defect or want of notice, if they have in truth been called upon and spoken." [Internal

quotation marks omitted.]); *Wurst* v. *Lowery*, 286 Ark. 474, 475, 695 S.W.2d 378 (1985) ("the failure to publish notice of an election [on whether to allow the sale of alcohol] is immaterial if the election is actually held and the electors have not been deprived of the opportunity to express themselves"); *Menlo Park City School District* v. *Tormey*, 218 Cal. App. 2d 76, 84, 32 Cal. Rptr. 82 (1963) (failure of governing board of school district to publish in newspaper notice of election on question of whether maximum tax rate of district should be increased did not invalidate election when county clerk complied with statute requiring that sample ballot be sent to all registered voters); *People* v. *Carlsbad*, 128 Cal. App. 2d 77, 84, 274 P.2d 740 (1954) ("[t]he test for determining whether an election is invalidated because of a failure to strictly comply with the notice provisions prescribed by the statute has frequently been stated to be whether the voters generally have had knowledge of the election and full opportunity to express their will, or whether the variance may have affected the result by depriving a sufficient number of voters of the opportunity to exercise their franchise"); *People* v. *Carlsbad*, supra, 84 (when election notice failed to provide date of election and information regarding issue to be voted on, failure did not invalidate election when date of election "was repeatedly and widely publicized with a cumulative effect far beyond that which would normally follow a mere compliance with the statute"); *Weisgerber* v. *Nez Perce County*, 33 Idaho 670, 675, 197 P. 562 (1921) (special election was valid even though there was no substantial compliance with notice provision because "great weight of authority" supports rule that "[s]tatutory directions as to the time and manner of giving notice of elections are mandatory upon the officers charged with the duty of calling the election, and will be upheld strictly in a direct action instituted before an election; but after an election has been held, such statutory requirements are directory, unless it appears that the failure to give notice for the full time specified by the statute has prevented electors from giving a full and free express of their will at the election"); *Weisgerber* v. *Nez Perce County*, supra, 675 (citing cases); *Demaree* v. *Johnson*, 150 Ind. 419, 426, 50 N.E. 376 (1898) (defective notice of special election does not invalidate election if voters had actual notice); *Dishon* v. *Smith*, 10 Iowa 212, 218–19 (1859) (result in election on whether to move county seat was valid even without notice when "there was an election and the people of the county voted, and it is not alleged that any portion of them failed in knowledge of the pendency of the question, or to exercise their franchise"); *Ginn* v. *Bonita*, 62 So. 2d 159, 162 (La. App. 1952) (failure to publish notice of election in newspaper as required by statute did not invalidate election when it was clear from large percentage of electorate who voted "that publication in the official journal would not have had an appreciable effect upon the number voting"); *Ellis* v. *Karl*, 7 Neb. 381, 390 (1878) (stating in dictum that failure to provide proper notice of special election would not invalidate election when there was no evidence that "any different result would have been obtained by giving the full statutory notice"); *Albuquerque* v. *Water Supply Co.*, 24 N.M. 368, 382, 174 P. 217 (1918) (failure to comply with notice provision for election on bond issues did not require invalidation of election results); *State ex rel. Board of Education* v. *Jones*, 131 N.E.2d 704, 708 (Ohio 1955) (when board of education failed to strictly comply with statute requiring publication of notice of election on bond issue, extensive advertising campaign, including distribution of literature, mailings to residents, house to house canvassing, posting of notices in public places, newspaper items and public meeting constituted "substantial compliance as to notice"); *In re License of Wilson-Patton Post 536, Inc.*, 62 Pa. D. & C. 215, 229–30 (1948) (failure to set forth place where election was to be held did not invalidate referendum); *Yonce* v. *Lybrand*, 254 S.C. 14, 17, 173 S.E.2d 148 (1970) (failure to comply strictly with statutory notice provision did not invalidate election when "[n]o inference may be drawn from the record that a single vote was lost or affected by failure to publish a notice"); *Yonce* v. *Lybrand*, supra, 17 ("unless the result of an election is changed or rendered doubtful, it will not be set aside on account of mere irregularities or illegalities" [internal quotation marks omitted]); *State* v. *Quarterly County Court*, 209 Tenn. 153, 155, 351 S.W.2d 390 (1961) (when voters have actual notice of election and have participated in election to usual extent, election is not invalidated by failure to comply strictly with statutory notice provision); *Norman* v. *Thompson*, 96 Tex. 250, 254, 72 S.W. 62 (1903) (failure to strictly comply with notice provision for referendum did not constitute grounds for contesting referendum); *Vickers* v. *Schultz*, 195 Wn. 651, 656–57, 81 P.2d 808 (1938) (failure of clerk of election board to post notice of election on formation of public utility district in each polling place in county as required by statute did not require invalidation of election when election was subject "of continued public discussion and controversy" from time that formation of district was first proposed up to time of election and "[t]he vote was such, as compared with the votes upon other propositions, as to indicate an intelligent and well-informed expression of the popular will" [internal quotation marks omitted]).

The dissent contends that our reliance on these cases is misplaced

because, in all but two of them, "there was at least partial, if not substantial, compliance with the applicable statutory notice requirements." See *Wurst* v. *Lowery*, supra, 286 Ark. 475; *Dishon* v. *Smith*, supra, 10 Iowa 218; see also *Weisgerber* v. *Nez Perce County*, supra, 33 Idaho 675 (special election was valid even though there was no substantial compliance with notice provision). The question that the court addressed in all of the other cases, however, was whether the defect in the notice could have affected the result of the election, not whether there was at least partial compliance with the statutory notice provision. See *Henard* v. *St. Francis Election Committee*, supra, 301 Ark. 463 ("[n]one of the improprieties alleged by [the] appellants appear to have affected the outcome of this election"); *Menlo Park City School District* v. *Tormey*, supra, 218 Cal. App. 2d 84 ("the substantial rights of the electors were in nowise affected"); *People* v. *Carlsbad*, supra, 128 Cal. App. 2d 84 (where "a considerable deviation [from notice requirement] appears the burden rests upon the party seeking to uphold the election to show that such variance has not affected the result"); *Demaree* v. *Johnson*, supra, 150 Ind. 426 ("if it were shown that the failure to give the notice in the manner provided for in the statute had resulted in preventing such a number of electors from participating in the election as would have changed the result if they had voted, then the failure to give the notice as required by the statute would be fatal"); *Ginn* v. *Bonita*, supra, 62 So. 2d 162 ("publication in the official journal would not have had an appreciable effect upon the number voting"); *Ellis* v. *Karl*, supra, 7 Neb. 390 (question before court was whether "any different result would have been obtained by giving the full statutory notice"); *Albuquerque* v. *Water Supply Co.*, supra, 24 N.M. 382 (when official has failed to comply with notice requirements, result will not be invalidated unless "it . . . be shown that, if the statute had been strictly complied with, the result would have been different"); *State ex rel. Board of Education, Bellefontaine City School District* v. *Jones*, supra, 131 N.E.2d 708 ("[n]o claims are made that the result of the election might have been different, or that any elector was induced to cast his ballot otherwise than he would have done had the notice fully complied with the statute"); *In re License of Wilson-Patton Post 536, Inc.*, supra, 62 Pa. D. & C. 230 (when "failure to set forth in the notice the place where the election was to be held . . . had no vital influence on the result of the election [and did not] prevent a full and free expression of the popular will" election would not be invalidated); *Yonce* v. *Lybrand*, supra, 254 S.C. 18 ("where the result of an election is not made doubtful nor changed, irregularities or illegalities, in the absence of fraud, will not cause the expressed will of the body of the voters to be set aside" [internal quotation marks omitted]); *State* v. *Quarterly County Court*, supra, 209 Tenn. 155 ("[w]hen no one is prejudiced or damaged by the failure to comply strictly with the [notice] statute, the election will not be disturbed"); *Norman* v. *Thompson*, supra, 96 Tex. 254 ("if it appears from the evidence that . . . irregularities existed as to render the true result of the election impossible to be arrived at, or very doubtful of ascertaining, the court shall adjudge such election to be void" [internal quotation marks omitted]); *Vickers* v. *Schultz*, supra, 195 Wn. 657 ("[t]he want of statutory notice, it is clear, did not result in deprivation of sufficient number of the electors of the opportunity to exercise their franchise to change the result of the election").

[20] See *Bilek* v. *Chicago*, 396 Ill. 445, 461, 71 N.E.2d 789 (1947) ("[t]he election provided for is a special election, since there is no general law providing for it and fixing the time when it shall be held, and in such a case if notice is not given as required for the length of time and by the number of notices required by the statute, the election will be void" [internal quotation marks omitted]); *Walker* v. *Oak Cliff Volunteer Fire Protection District*, 807 P.2d 762, 766 (Okla. 1990) ("Notice requirements may be relaxed for general elections, because the public is presumed to know when they are held. However, special elections are not set on a date certain." [Footnote omitted.]); see also 26 Am. Jur. 2d 79–80, Elections § 277 (2014) ("[n]otice requirements may be relaxed for general elections because the public is presumed to know when they are held, but strict compliance with notice requirements for a special election normally is required although some jurisdictions only require substantial compliance" [footnotes omitted]); but see *Hill* v. *Skinner*, 169 N.C. 405, 411, 86 S.E. 351 (1915) ("In the case of special elections, when the law does not fix the time and place of holding the same, but they are to be fixed by some authority, failure to give notice or issue a proclamation of the election will render it a nullity unless the people have actual knowledge and attend, so that the result is not affected. If it appears that the people generally had actual knowledge of a special election, so that the result would not have been different if proper notice had been given, failure to give such notice does not vitiate the election." [Internal quotation marks omitted.]); 26 Am. Jur. 2d, supra, § 277, p. 80 ("[a] failure to comply with statutory-notice requirements will invalidate an election which has already been held only if it appears that it prevented the electors from obtaining a free and full expression of their will at the election or if the statute contains a further provision voiding an election

not held in accordance therewith"), citing *Moore* v. *Page*, 148 Ariz. 151, 159, 713 P.2d 813 (1986) (stating in dictum that failure to strictly comply with statutes governing special election, thereby potentially disenfranchising voters, would not require invalidation of election when plaintiff failed "to show that [noncompliance] may have affected the result of the election"); 26 Am. Jur. 2d, supra, § 280, p. 82 ("Even in special elections . . . following the particular form and manner required by a statute for giving notice is not absolutely essential provided that there has been a substantial compliance with statutory provisions. Further, the courts are reluctant to defeat a fair expression of the popular will in either a general or special election. Thus, any errors or defects claimed to exist in a notice of election generally will not invalidate the election unless there is some showing that the electors were in fact misled by such defects." [Footnotes omitted.]).

[21] See *Whittle* v. *Whitley*, 202 Ga. 633, 44 S.E.2d 241 (1947) (partial compliance with notice provision was not sufficient); *Chanute* v. *Davis*, 85 Kan. 188, 190, 116 P. 367 (1911) (same); *Chumley* v. *Williams*, 639 S.W.2d 557, 560 (Ky. App. 1982) ("where an official makes no effort to comply with the [notice] statute, that failure is fatal and the doctrine of substantial compliance cannot be utilized"); *Neal* v. *Board of Supervisors*, 217 Miss. 102, 111, 63 So. 2d 540 (1953) (partial compliance with notice provision was not sufficient); *State ex rel. Berkeley* v. *Holmes*, 358 Mo. 1237, 1243–44, 219 S.W.2d 650 (1949) (time requirements of statutory notice provisions are mandatory and failure to comply strictly with them invalidates election); *Appeal of Frederick H. Harper, Jr., Inc.*, 150 Pa. Super. 569, 575, 29 A.2d 236 (1942) ("[t]he entire failure to give the statutory notice rendered the special election invalid"); *Turner* v. *Lewie*, 201 S.W.2d 86, 89–90 (Tex. Civ. App. 1947) (partial compliance with statutory notice provision was not sufficient); see also footnote 23 of this opinion; but see *Wurst* v. *Lowery*, 286 Ark. 474, 475, 695 S.W.2d 378 (1985) ("the failure to publish notice of an election [on whether to allow the sale of alcohol] is immaterial if the election is actually held and the electors have not been deprived of the opportunity to express themselves"); *Dishon* v. *Smith*, 10 Iowa 212, 218 (1859) (failure to provide notice of election on question of whether to move county seat did not invalidate result because "the people are not to be disfranchised, to be deprived of their voice, by the omission of some duty by an officer, if an election has, in fact, been held at the proper time").

[22] In other words, because the public is presumed to know when regular elections are held, it is possible that evidence that would be insufficient to establish that the result of a general election was seriously in doubt might be sufficient to establish that the result of a referendum was seriously in doubt. The evidence in the present case, however, overwhelmingly supports the conclusion that the voters in the regional school district, as a class, received *at least* as much notice of the referendum as they would have received if the defendants had strictly complied with the statutory notice provisions, and the plaintiffs presented no evidence that any individual voter who otherwise would have voted in the referendum was prevented from doing so by the defendants' failure to comply with the statutory notice provisions.

[23] Accordingly, we are not persuaded by the cases that have adopted such reasoning. See *Chumley* v. *Williams*, 539 S.W.2d 557, 559–60 (Ky. App. 1982) (if official partially complies with notice provision and "attempted compliance, together with other publicity, [is] sufficient to notify the voters of the pending election," election will be validated, but "where an official makes no effort to comply with the statute, that failure is fatal and the doctrine of substantial compliance cannot be utilized," even if voters had actual notice and strict compliance with notice provision would not have affected result).

[24] The dissent relies on this court's decision in *Pollard* v. *Norwalk*, 108 Conn. 145, 142 A. 807 (1928), to support its conclusion that this court previously has held that towns must strictly comply with notice provisions for special elections. It is not entirely clear, however, whether that case involved a defective notice for an election or a defective notice for a town meeting. At one point, the opinion refers to a "city and town election" at which voters approved the issuance of bonds; id., 146; but the opinion then states that "notice of the *meeting*" did not comply with the notice provisions of the city charter. (Emphasis added.) Id. In addition, the court in *Pollard* relied entirely on case law governing the notice requirements for town meetings. Id. In any event, the decision in *Pollard* is cursory, and the court did not engage in any substantive analysis of the public policy concerns implicated by the judicial invalidation of elections. Accordingly, to the extent that *Pollard* supports the dissent's position, we conclude that it is inconsistent with later case law, namely *Bortner* and *Sadlowski*, and, therefore, it must be overruled.

[25] The trial court rejected the plaintiff's claim pursuant to *Lenarz* because *Lenarz* involved the constitutional right to counsel while, in the present case, the plaintiffs' constitutional claims were stricken from the operative complaint. The plaintiffs contend that, to the contrary, their constitutional due process claim raised in count five of the operative complaint survived the defendants' motion to strike. See footnote 11 of this opinion. We note, however, that the trial court struck an identical constitutional claim in count two of the operative complaint. In any event, regardless of whether the trial court intended to strike the plaintiffs' constitutional due process claim, that claim was premised on the alleged violation of the statutory notice provisions. The plaintiffs are essentially asking us to alter the standard that this court applies to a claim that an election must be invalidated because of irregularities in the election process by recharacterizing that claim as a constitutional claim. We decline this invitation. Accordingly, we conclude that, even assuming that the plaintiffs' due process claim survived the defendants' motion to strike, because we conclude that the trial court properly granted summary judgment for the defendants on the plaintiffs' statutory claims, there is no basis for the constitutional claim.

[26] We do not suggest that a plaintiff who has claimed that there was no compliance with a statutory notice provision for an election or a referendum is always required to identify specific persons who would have voted if the officials conducting the proceeding had complied with the statutory notice provision. For example, if there was *no* statutory or actual notice of the election or referendum, it reasonably could be inferred from that fact alone that a significant number of voters were prevented from voting. Where, as here, the public received actual notice of the referendum that equaled or exceeded the statutorily required notice, however, no such inference can be drawn.

[27] As we have indicated herein, the vote in the June 18, 2013 referendum was 1269 to 1265 in favor of approving the referendum question, for a total of 2534 votes cast. The defendants presented an affidavit in support of their motions for summary judgment indicating that, in eight other recent referenda within the regional school district between May 4, 2011, and May 6, 2014, a total of votes cast was 2402, 2132, 2053, 2039, 2090, 2175, 2325, and 2101, respectively. Thus, there were more votes cast in the June 18, 2013 referendum than in any of these other referenda.

[28] Because we conclude that there was no genuine issue of material fact as to whether the defendants' failure to strictly comply with the warning provisions of §§ 10-56 (a), 10-47c and 9-226 caused the referendum results to be seriously in doubt, we need not consider whether the defendants substantially complied with those provisions. See *Bortner* v. *Woodbridge*, supra, 250 Conn. 258 (election may be judicially invalidated only when "[1] there were substantial violations of the requirements of the [governing statutes] . . . *and* [2] as a result of those violations, the reliability of the result of the election is seriously in doubt" [emphasis added]). We also need not address the defendants' claim, as an alternative ground for affirmance, that they are entitled to judgment as a matter of law with respect to the plaintiffs' claim for damages because §§ 9-7b (a) (9) and 9-371b provide the exclusive vehicles for contesting a referendum, and those statutes provide only equitable relief.